Eddie Mitchell TASBY, et al., Plaintiffs

Black Coalition to Maximize Education Intervenor– Plaintiff

v.

Dr. Mike MOSES, General Superintendent, Dallas Independent School District, et al. Defendants

No. CIV.A.3:70–CV–4211–H.

United States District Court, N.D. Texas, Dallas Division.

June 5, 2003.

See also 342 F.Supp. 945.

---

### *MEMORANDUM OPINION AND ORDER*

SANDERS, Senior District Judge.

## Table of Contents

I. Background ................................................758
 A. History of DISD Desegregation Litigation ................................758
 B. The District Today ................................................760
 1. *Leadership* ................................................760
 2. *Declaration of Commitments and Covenants* ........................761
 C. Principles of Law ................................................762
 D. The Positions of the Parties ................................................764

II. Factors Relevant to Whether Dismissal is Appropriate ........................765
 A. Stipulated Matters ................................................765
 B. Non–Contested Matters ................................................765
 C. Contested Issues ................................................767
 1. *Learning Centers* ................................................767
 2. *Bilingual/ESL Programs* ................................................769
 3. *Early Childhood Education* ................................................772
 4. *Magnet Schools* ................................................775
 5. *Other Achievement–Based Remedies* ........................777
 6. *The Achievement Gap* ................................................779

III. Conclusion ................................................780

Before the Court are Defendants' Motion for Hearing, filed January 9, 2003; Plaintiffs' Supplemental Proposed Findings of Fact and Conclusions of Law, Defendants' Post–Trial Proposed Findings of Fact, Defendants' Post–Trial Proposed Conclusions of Law, Plaintiffs' Responses to the Court's Questions at Conclusion of Hearing, and Defendants' Response to Court's Post–Trial Questions, all filed April 25, 2003; and related pleadings.[1]

On March 24–31 and April 7–10, 2003, the Court held an evidentiary hearing on the Motion for Hearing and to Dismiss, filed January 9, 2003, by Defendant Dallas Independent School District ("DISD"). For the reasons set forth in this opinion the Court concludes that the Motion to Dismiss should be granted.

## I. Background

### A. *History of DISD Desegregation Litigation*

At the time of the Supreme Court's decision in *Brown v. Board of Education,* 347

---

1. As used in this Opinion, the word "Plaintiffs" includes the Intervenor Black Coalition to Maximize Education.

U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) public schools in Texas were segregated by law. Although *Brown* mandated desegregation, for many years efforts toward compliance with the Supreme Court decision were almost non-existent and grudging at best.[2]

In October 1970 Plaintiff Sam Tasby filed this suit against DISD on behalf of his children, Eddie Mitchell Tasby and Philip Wayne Tasby, African American students in the DISD. Mr. Tasby's children were being required to ride city buses past a nearby "white school" to attend distant "black schools" in West Dallas. (Tasby, V. 7 at 5). Other African Americans and Latinos joined the case—all seeking the development of a meaningful and comprehensive desegregation plan for DISD.[3] *Tasby v. Estes,* 342 F.Supp. 945 (N.D.Tex.1971). At the time Plaintiff Tasby filed his suit, DISD was the eighth largest school system in the nation with 180,000 students and a predominantly Anglo student body. However, most of the DISD schools were still one-race schools, *i.e.,* comprised of at least 90% Anglo or 90% minority students. *Tasby,* 869 F.Supp. 454.

The *Tasby* case was originally assigned to Judge W.M. Taylor, Jr., and he presided over the litigation until he withdrew in 1981. Upon Judge Taylor's withdrawal, the case was assigned by random draw to the undersigned Judge, Judge Barefoot Sanders. At that time the case was pending on remand from the Fifth Circuit with directions to formulate a new student assignment plan and to make findings to justify the maintenance of any one-race

school that might be a part of the new plan. *Tasby v. Estes,* 572 F.2d 1010, 1012 (5th Cir.1978).

After an extensive evidentiary hearing in spring 1981, the Court filed an Opinion rejecting crosstown busing, keeping in place previous desegregation remedies for grades 4–8, changing attendance zones for certain schools, and instituting programmatic remedies designed to close the achievement gap between minority students and their Anglo counterparts. *Tasby,* 520 F.Supp. 683.

In 1984 the Court directed the District to open three Learning Centers in South Dallas for grades 4–6. These Centers enabled previously bused minority students to return to their neighborhood schools and instituted creative educational remedies to improve the achievement levels of these students. *Tasby v. Wright,* 585 F.Supp. 453, 455–56 (N.D.Tex.1984), *aff'd sub nom. Tasby v. Black Coalition to Maximize Educ.,* 771 F.2d 849, 856 (5th Cir.1985). In 1986 the Court directed the opening of three Learning Centers in West Dallas. *Tasby v. Wright,* 630 F.Supp. 597 (N.D.Tex.1986). Additional Centers have since been established. *See infra.*

In 1992 the Court ordered the construction of Townview Magnet, long sought by the minority community. *Tasby v. Edwards,* 807 F.Supp. 421 (N.D.Tex.1992).

In 1994 the Court granted DISD's Motion for Unitary Status, holding that DISD was in compliance with the factors set forth by the Supreme Court in *Green v. County School Board,* 391 U.S. 430, 435,

---

**2.** DISD's pre–1970 desegregation litigation is summarized in this Court's 1981 Opinion, *Tasby v. Wright,* 520 F.Supp. 683, 687 (N.D.Tex.1981). *See also Tasby v. Woolery,* 869 F.Supp. 454, 456 (N.D.Tex.1994).

**3.** The Court acknowledges that the "naming" of racial/ethnic groups is fraught with prob-

lems. Throughout the course of this case various terms have been employed for the three main groups discussed. For purposes of uniformity the terms "Anglo," "African American," and "Latino" will be employed throughout this opinion.

88 S.Ct. 1689, 20 L.Ed.2d 716 (1968). *See Tasby*, 869 F.Supp. at 477. The Court ordered a three-year monitoring period and required DISD to make several improvements specified in the Order.

In 1997, in *Tasby v. Gonzalez*, 972 F.Supp. 1065 (N.D.Tex.1997), the Court determined that the School District was not in compliance with the Court's faculty desegregation orders and accepted a DISD plan for faculty desegregation which modified the then-existing ethnic ratio requirements for faculty.

The three-year monitoring period ordered in the Court's 1994 Opinion has stretched into nine years, during which DISD has gone through considerable turmoil. DISD did not request, and the Court did not order, a hearing to consider dismissal during this nine-year period.

### B. The District Today

The DISD has changed considerably since this suit was first filed in 1970. The DISD remains one of the nation's largest urban school districts, but the current student population is less than it was in 1970; there are currently 163,324 students in the district, down from 180,000. (Moses, V. 1 at 78); *Tasby*, 342 F.Supp. at 950. The district currently operates 218 campuses, up from 180 in 1970. (Moses, V. 1 at 99); *Tasby*, 342 F.Supp. at 950.

The most significant change since 1970, however, is in the racial/ethnic composition of DISD students. As is the case with many other urban districts (*e.g.*, Houston and Detroit) the racial/ethnic composition of the DISD student population has been transformed over the last 30 years: minority populations are now dominant in terms of numbers. (Moses, V. 1 at 80–81). The percentage of African American students is approximately the same as in 1970 when the case was filed: 33% then, 32% today. (Moses, V. 1 at 192). The percentages of Latino and Anglo students in the District,

however, have been transposed during these same years-the Latino student population has grown from 7% to 58.8%, and the Anglo population has decreased from 59% to 6.7%. *Id.* In conjunction with this change, 32% of the students in the District are limited English proficient, and more than 70 different languages are spoken in the schools. (Moses, V. 1 at 78). Further, 76% of the students in the District are economically disadvantaged. (Moses, V. 1 at 81).

### 1. Leadership

In the last several years, the leadership of the DISD-which had been embroiled in legal and political turmoil in the 1990s-has made definite progress in working cooperatively and productively for the good of the students in the District.

In 2000, after several years of upheaval in the Superintendent's Office, Dr. Mike Moses was hired by the District to be General Superintendent (Moses, V. 1 at 117). Dr. Moses, a former Texas Commissioner of Education with extensive experience in managing both rural and urban school districts, has brought stability to the Office. (Moses, V. 1 at 39–40). In his brief tenure he has won the confidence of the Dallas community, and has had his leadership confirmed by the passage of a $1.37 billion bond issue in 2002, approved by a 70% vote. (Moses, V. 1 at 60). This is the largest school bond issue in the DISD's and in Texas's history, and it is among the largest ever to pass in the nation. (Moses, V. 1 at 97–98). The money is dedicated to improving facilities; all campuses are to receive some remodeling or renovation, and 20 new schools are to be built. (Moses, V. 1 at 99).

In terms of his staff, Dr. Moses has given substantial responsibility to highly qualified and professional administrators from minority communities. For example,

Dr. Carol Francois, former Associate Commissioner for Special Populations at the Texas Education Agency and former National Alliance of Black Educators Teacher of the Year, is his chief of staff. (Moses, V. 1 at 63; Francois, V. 2 at 125). In addition, Dr. Moses has a central administration which is comprised of 56.6% ethnic minorities. (Defs.' Ex. 29 at 1). Further, 74.5% of DISD's school campus administration (principals, assistant principals, and deans) are now ethnic minorities, as are 54.7% of DISD's teachers. (Defs.' Ex. 29 at 1).

In addition to these positive signs in the DISD administration, there are very encouraging signs within the DISD Board of Trustees. After many years of problems in the 1990s, the Board now seems to be on a path of working together with common understandings and commitments to the students of the District. (Moses, V. 1 at 100). Dr. Moses testified that his relationship with the Board is both positive and constructive. (Moses, V. 1 at 99). *See infra* at 15.

The Board is composed of nine members, and for the first time in DISD history, the Board is majority minority. (Anchia, V. 8A at 5; May, V. 8A, at 27; *see also* DISD "Notice of Incumbency," filed May 20, 2003). Of the nine Board members, three are African American; two are Latino; and four are Anglo. (*See* Notice of Incumbency). Hollis Brashear, an African American member, was recently elected President. *Id.* The Court recognizes that the racial composition of a Board of Trustees does not tell the whole story. Nevertheless, the Court believes that the interests of minority children in the District will be fully considered by this Board. *See Tasby,* 520 F.Supp. 683 (1981); *Tasby v. Wright,* 542 F.Supp. 134 (N.D.Tex.1981); *Calhoun v. Cook,* 522 F.2d 717, 719 (5th Cir.1975).

### 2. *Declaration of Commitments and Covenants*

In November, at the same meeting in which the DISD Board of Trustees voted to direct its counsel to request this hearing for dismissal, the Board adopted the Declaration of Commitments and Covenants Upon Release from Court Supervision ("Covenants") by a vote of eight to one. (Defs.' Ex. 33). The Covenants will become official policy of the DISD immediately upon the release of the District from supervision of the Court. (Covenants, No. 13; Defs.' Ex. 33).

These Covenants declare the intention of the Board of Trustees to "continue to operate a unitary school system" and "to promote the availability of equal educational opportunities to all its students regardless of race, national origin, ethnicity, gender or religion." (Covenants, No. 1; Defs.' Ex. 33). They also commit the DISD to continuing the principles of diversity in employment at all levels. (Covenants, No. 2; Defs.' Ex. 33).

The Covenants specifically commit the District to maintaining strong Early Childhood Education programs on each campus which includes K–3 students (Covenants, No. 3; Defs.' Ex. 33); maintaining tuition credits for students currently enrolled in the majority-to-minority transfer program (Covenants, No. 4; Defs.' Ex. 33); maintaining a program of Magnet schools (including Vanguard schools, Academies, high schools designated as Magnets, and Montessori schools) which will be evaluated regularly (Covenants, No. 5; Defs.' Ex. 33); maintaining programs for talented and gifted students in all elementary, middle, and high schools in accordance with State law (Covenants, No. 6; Defs.' Ex. 33); maintaining the South, West, and East Dallas Learning Centers along with providing supplemental funding for students in at-risk situations (Covenants, Nos.

7–8; Defs.' Ex. 33); maintaining comprehensive Bilingual and English as a Second Language programs in grades PK–12 (Covenants, No. 9; Defs.' Ex. 33); and maintaining a program of facility construction, addition, renovation, repair and maintenance, administered without regard to race, ethnicity, national origin, gender, or religion of the students enrolled at particular facilities. (Covenants, No. 10; Defs.' Ex. 33).

The Court relies on these Covenants as a sign of the good faith of the Board that it will continue the progress it has made in terms of developing and maintaining a unitary system in which all children receive equal and quality education. The Court notes that Dr. Moses and all of the Trustees who testified about the Covenants stated that the current Board supports them, and intends to work toward their implementation. ( Moses, V.1 at 103–107; Zornes, V. 10 at 106–09; Anchia, V. 8A at 7–9; May, V. 8A at 39–40; Price, V. 8A at 68; Brashear, V. 8A at 73–74; Blackburn, V. 8A at 86–87). The Court also notes that the Covenants may not be modified, altered, amended, repealed, or vacated without approval of seven of the members of the Board. (Covenants, No. 13; Defs.' Ex. 33).

The Court would be gravely concerned if there were any material departures from the Covenants during the three year term which begins upon the dismissal of this case. See FED. R. CIV. P. 60(b).

### C. Principles of Law

Forty-nine years ago, the Supreme Court addressed the issue of racial segregation in public schools in *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) (*Brown I*). *See also Brown v. Bd. of Educ.,* 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955) (*Brown II*). *Brown I* declared that public school systems segregated by race are unconstitutional, because they deny minority students equal protection of the law under the Fourteenth Amendment. *Brown I* at 495, 74 S.Ct. 686. *Brown II* directed defendant school systems and District Courts to devise and implement remedial racially-non-discriminatory systems with "all deliberate speed." *Brown II* at 301, 75 S.Ct. 753. The Supreme Court ordered that jurisdiction over these desegregation lawsuits would remain with District Courts even after the remedy was ordered, to guarantee continued judicial involvement in eliminating the legacy of dual school systems. *Id.*

Since *Brown II,* the Supreme Court has made it clear that because the legal basis · for federal court supervision of school districts is the unconstitutional racial segregation of their students, the basis for releasing school districts from court supervision is the school districts' elimination of that segregation and its effects. *See Pasadena City Bd. of Educ. v. Spangler,* 427 U.S. 424, 442, 96 S.Ct. 2697, 49 L.Ed.2d 599 (1976) ("[T]he dangers which induced the original determination · of constitutional infringements in Pasadena have not diminished sufficiently to require modification or dissolution of the original Order."); *See also Milliken v. Bradley,* 433 U.S. 267, 280, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977) ("[T]he nature of the desegregation remedy is to be determined by the nature and scope of the constitutional violation."); *Swann v. Charlotte–Mecklenburg Bd. of Educ.,* 402 U.S. 1, 16, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971).

In 1968, in *Green v. County School Board,* 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968), the Supreme Court identified six areas (the *"Green* factors") for Courts to examine in determining whether or not the effects (or "vestiges") of segregation remain: student assign-

ment, faculty, staff, transportation, extra-curricular activities and facilities. These areas were later described by the Court as the "most important indicia of a racially segregated school system." *Missouri v. Jenkins*, 515 U.S. 70, 88, 115 S.Ct. 2038, 132 L.Ed.2d 63 (1995), *citing Green*, 391 U.S. at 435, 88 S.Ct. 1689. *See Bd. of Educ. v. Dowell*, 498 U.S. 237, 250, 111 S.Ct. 630, 112 L.Ed.2d 715 (1991).

In recent years the Supreme Court has clarified how and when District Courts should release school districts from federal jurisdiction and from court-ordered desegregation plans. In the early 1990s the Court issued three opinions on this matter: *Dowell, Freeman,* and *Jenkins. See Dowell*, 498 U.S. 237, 111 S.Ct. 630 (1991); *Freeman v. Pitts*, 503 U.S. 467, 112 S.Ct. 1430, 118 L.Ed.2d 108 (1992); *Jenkins*, 515 U.S. 70, 115 S.Ct. 2038 (1995). In all three cases the Supreme Court stressed the importance of local control and the transitory nature of judicial supervision. *Dowell*, 498 U.S. at 247, 111 S.Ct. 630; *Freeman*, 503 U.S. at 489–90, 112 S.Ct. 1430; *Jenkins*, 515 U.S. at 88–89, 115 S.Ct. 2038.

In the 1991 *Dowell* opinion, a case involving dissolution of a desegregation plan in Oklahoma City, the Supreme Court articulated a strong federal policy favoring returning control of school districts to local authorities. In that case the Court stressed that "a violation of the Constitution by the local authorities" was the original legal justification for District Court supervision of school systems; therefore, a desegregation decree should be dissolved after the local authorities have operated in compliance with the decree for a reasonable period of time. 498 U.S. at 248, 111 S.Ct. 630.

In 1992 the Supreme Court decided *Freeman,* the second case on terminating a desegregation order, which involved the school district of DeKalb County, Georgia. 503 U.S. 467, 112 S.Ct. 1430, 118 L.Ed.2d 108 (1992). In that case the Court reaffirmed the factors for dismissal outlined in *Dowell. Id.* at 490, 492, 112 S.Ct. 1430. It also stressed returning schools to the control of local authorities "at the earliest practicable date." *Id.* at 490, 112 S.Ct. 1430. *Freeman* sets forth factors which echo and re-emphasize the *Dowell* factors. Under *Freeman,* school districts must have complied with previous Court desegregation decrees and must have eliminated, to the extent practicable, the vestiges of the past unconstitutional discrimination.[4]

In *Jenkins,* the third case, the Supreme Court reaffirmed the principle of local control articulated in *Dowell* and *Freeman.* 515 U.S. 70, at 88–89, 101, 115 S.Ct. 2038. It also addressed the issue of student achievement levels, and whether they are appropriately taken into account by District Courts in determining whether to release school districts from judicial control. *Jenkins* affirms that the guiding principle for District Courts in terminating desegregation cases remains the elimination of vestiges of unconstitutional racial discrimination, holding that the "basic task of the District Court is to decide whether the reduction in achievement by minority students attributable to prior *de jure* segregation has been remedied to the extent practicable." *Id.* at 101, 115 S.Ct. 2038.

In *Youngblood v. Board of Public Instruction*, 448 F.2d 770 (1971) the Fifth Circuit outlined a framework for District Courts to employ in terminating school desegregation cases. A District Court is required to retain jurisdiction over a school district for three years after finding it to be unitary, during which time the

---

4. *Freeman* differs from *Dowell* in that it allows District Courts to release school districts from desegregation orders on an incremental basis.

district is to submit annual reports to the Court. Then, a desegregation suit may be dismissed only after a hearing in which the complainants are given an opportunity to show why dismissal should be further delayed. *Id.* at 771.

The Fifth Circuit has emphasized that in desegregation cases District Courts should focus on the constitutional nature of the wrong. In *Flax v. Potts*, 915 F.2d 155 (1990) the Circuit reiterated the principle that court-ordered desegregation plans were designed to remedy constitutional violations; District Courts should, therefore, weigh school districts' compliance with court orders in the light of the original constitutional violation. "[T]o continue supervision once the [constitutional] wrong is righted, ... 'effectively changes the constitutional measure of the wrong itself: it transposes the dictates of the remedy for the dictates of the constitution.'" *Id.* at 159, quoting *U.S. v. Overton*, 834 F.2d 1171, 1176 (5th Cir.1987). The Circuit also articulated the important principle that "both particular aspects of [a] desegregation plan and the overall plan itself may be unitary even when particular aspects contain deficiencies than are not serious..." *Flax*, 915 F.2d at 158.

Further, the Circuit warns that because retained court supervision of school districts restricts state government, principles of federalism require that federal courts "draw the limits which they 'impose on the state no more tightly than the limits of the Constitution.'" *Flax* 915 F.2d at 159 quoting *Overton*, 834 F.2d at 1177.

 Two principles regarding the determination of when a school district should be released from Court supervision emerge strongly from the foregoing authorities:

(1) The District Court's focus in determining whether to release a school district from its jurisdiction and from remedial desegregation orders should be on the con-

stitutional violations of the district and the extent to which the district has eliminated the original *de jure* constitutional violations and the vestiges of those violations.

(2) Control of school districts should be returned to local authorities when districts demonstrate that they have eliminated both the *de jure* segregation and the vestiges of that segregation to the extent practicable.

In the present case, the DISD was declared unitary by this Court in 1994. *Tasby*, 869 F.Supp. 454. At that time the Court gave the following instructions to the Parties:

"After three years, if the District has continued to substantially comply with the Judgment and other desegregation decrees of the Court, and has met the requirements of this Opinion, the Court will hold a hearing at which Plaintiffs and Intervenor will have opportunity to show cause why the case should not be dismissed. Unless good cause is shown, the Court will then relinquish jurisdiction and dismiss the case by appropriate decree." *Id.* at 478.

The Court has retained jurisdiction over the case, pending evidence of substantial compliance by the DISD. The recent hearing was scheduled on the motion of the DISD; the Plaintiffs oppose dismissal.

### D. The Positions of the Parties

Almost ten years has passed since this Court declared the DISD unitary. The District now seeks a declaration that it has "substantially complied" with all of the Court's orders. If the Court finds that the DISD has so complied, the case should be dismissed. Plaintiffs urge that while the DISD is in substantial compliance with many aspects of the Court's Orders, the District has not yet substantially complied in several areas and dismissal at this time would be premature.

It is fair to say that the DISD has made enormous progress in providing equal educational opportunities to all students. The parties at this time differ as to whether those efforts are enough to justify dismissal of this Court's supervision.

## II. Factors Relevant to Whether Dismissal is Appropriate

Keeping in mind the unique facts and circumstances of desegregation in the DISD, the history of this litigation, and guiding legal principles, this Court's task is to determine whether the DISD has substantially complied with the desegregation decrees of this Court. The DISD must have continued to comply in good faith with the Court's Orders and must have continued to eliminate the vestiges of past discrimination to the extent practicable. In making this determination, the Court will discuss evidence relevant to the District's current compliance with the Judgment and 1994 Order.[5] The desegregation requirements of the Judgment largely track the *Green* factors. When the Judgment is supplemented by the 1994 Order, all of the *Green* factors are taken into consideration.[6] There are also matters included in the Judgment and 1994 Order that are not specifically addressed in *Green*.[7] Those matters are also discussed here.

### A. Stipulated Matters

Before the March, 2003 hearing in this case, the parties jointly entered into stipu-lations relative to the DISD's compliance with the Judgment and 1994 Order. Specifically, the parties have stipulated that the DISD is in substantial compliance in the areas of (1) student assignment and attendance zones; (2) majority to minority transfers; (3) curriculum transfers; (4) teacher assignment; (5) facilities; (6) reporting and monitoring; (7) allocation of resources; and (8) transportation. (Joint Pretrial Order at 2). As these matters were stipulated by the parties, they are not the subject of this Opinion. *Flax*, 915 F.2d at 158-9. This case should be dismissed with respect to each of these factors.

### B. Non-Contested Matters

Several matters of importance in the Judgment and 1994 Order were neither stipulated nor contested either at the hearing or in the various filings before the Court. In the area of personnel, the parties did not stipulate to substantial compliance in the areas of staff/teacher recruitment, administrator assignment, or personnel training. Teacher recruitment is a contested issue in the areas of Bilingual/English as a Second Language ("ESL") and Learning Centers and will be discussed separately in the sections of this Memorandum Opinion and Order dedicated to those substantive areas. Personnel Training is a contested issue in the area of Early Childhood Education and will be discussed in that section of

---

5. Hereinafter, "Judgment" refers to the desegregation decree issued by this Court on February 1, 1982, as amended in 1987, and all other relevant desegregation orders predating the Court's Memorandum Opinion and Order of July 26, 1994. The Memorandum Opinion and Order of July 26, 1994 shall be referred to as the "1994 Order."

6. The *Green* factors are student assignment, faculty assignment, staff assignment, transportation, extracurricular activities, and facil-

ities. The Court notes at this time that no *Green* factor remains at issue in this case. As discussed below, the parties have either stipulated to the District's compliance or did not contest any *Green* factor at the hearing.

7. Specifically, student transfers, reporting and monitoring, allocation of resources, faculty recruitment, School Board commitment to desegregation efforts and assorted programmatic remedies.

this opinion. Neither administrator recruitment nor assignment practices were explicitly addressed by any party at the hearing. The Court notes that the Judgment directed the DISD to have an administration with an ethnic ratio of 40% Anglo, 40% African American, and 20% Latino. Judgment at 31. DISD's school administration is 25.5% Anglo, 50.1% African American, and 24% Latino. Defs.' Ex. 29. The Court commends the District on its continued efforts in this area.

Extra-curricular activities were also not addressed by the parties. In the 1994 Order, the Court held that the DISD had eliminated the vestiges of discrimination to the extent practicable in the area of extra-curricular activities.[8] The Court has been presented with no evidence to alter that opinion.

Other issues of the 1994 Order that were neither stipulated nor contested relate to the School Board. At issue at the time of the 1994 Order were (1) the racial harmony/disharmony of the school board; and (2) the perceived commitment to desegregation programs after unitary status could be granted. At the time the Court granted the DISD unitary status, there was evidence that many major board decisions split along racial lines. *See* 1994 Order at 475. Board deliberations were noted for their contentious nature with a perception that most votes had some racially-motivated aspect. At that time, the Court counseled the Board members and the community generally to "put behind the schisms of the past and to work toward a superior education for all students in the Dallas Independent School District." *Id* at 475. The Court heard extensive testimony at the recent hearing of dramatically improved Board relations, both within the

Board itself and between the Board and the Superintendent. (Moses, V. 1 at 57; Moses, V. 10 at 189–92). The Board is collaborative, and searches for consensus on difficult issues. (Moses, V. 1 at 99–100). The Board voted unanimously to call a vote for the facilities bond issue. Furthermore, the Covenants were passed by the Board in an 8/1 vote. (Moses, V. 1 at 106). The Court congratulates the Board on its efforts to work together to achieve the best possible education for all of the children of the DISD. The current positive and productive relationships among Board members and between the Board and the Superintendent are a necessary prerequisite to continued improvement of academic opportunities for Dallas children.

The Board has also come a long way on the issue of commitment of future School Boards to desegregation programs. The 1994 Order relied upon a representation from the then Board President Rene Castilla that the administration had no plans to change any Court-ordered desegregation program if the Court declared the DISD unitary. Today, in addition to similar assurances from the administration and all testifying board members, the Court also has before it the Covenants adopted by the Board. The Court commends the Board on its adoption of such a novel method of assuring the Court and the community of its continued commitment to desegregation principles. While some of the words of the Covenants are open to a flexible interpretation, the overall tone is one of continued commitment. The Court relies on the DISD's continued commitment to desegregation programs as evidenced by the Board-adopted Covenants. The Court would regard any material devi-

---

8. In fact, Plaintiffs were in agreement with the DISD at the time of the 1994 Order that DISD was unitary with respect to extracurricular activities, while the Intervenor argued that there was insufficient evidence to assess whether any vestiges remained. *See* 1994 Order at 476.

ation from those Covenants as a breach of faith. *See* FED. R. CIV. P. 60(b).

### C. Contested Issues

There remain only the areas of (1) Learning Centers; (2) the Bilingual/ESL Program; (3) Early Childhood Education; (4) Magnet Schools; (5) Other Achievement–Based Remedies; and (6) the Achievement Gap [9] as contested matters before the Court. The Court will address each of these areas separately.

### 1. Learning Centers

The Learning Centers were initially established by the District with the agreement of the Plaintiffs and the opposition of the Black Coalition. The purpose of the Learning Centers was to return minority students, who were being bused to predominately-minority schools in North Dallas, to superior educational programs in their neighborhoods. *See Tasby,* 585 F.Supp. 453, *aff'd,* 771 F.2d 849 (5th Cir. 1985) (establishing South Dallas Centers); *Tasby,* 630 F.Supp. 597 (establishing West Dallas Centers).

Originally, there were three Learning Centers in South Dallas and four in West Dallas. Today there are 16 Learning Centers.[10] (Ison–Newsome, V. 4 at 191). The Learning Centers are monitored by two area superintendents, Dr. Shirley Ison–Newsome and Miriam Kelley, who collaborate on their operation. (Kelley, V. 8A at 117, 120). Dr. Ison–Newsome and Ms. Kelley meet monthly with the Learning Center Management Council, which is composed of the principals of the 16 Learning Centers, to ensure compliance with the Court's orders as well as to improve communication among the administrators on educational topics generally. (Ison–Newsome, V. 4 at 215).

**a. *Implementation Plan:*** In 1994, the District adopted a Learning Center Implementation Plan and in the 1994 Order, the Court directed the District to meet its requirements.[11] (Defs.' Ex. 190, 191). That plan provided five goals for the learning centers: (1) to develop and foster a set of Center climate characteristics that distinguish the Centers from other schools and that influence the behavior of Center administrators, teachers, professional and support staff, students and families; (2) to develop and cultivate in all students positive perceptions of themselves as learners; (3) to enhance significantly the academic achievement of all students in reading, mathematics, and writing as measured by their performance on the Texas Assessment of Academic Skills test ("TAAS") (now the Texas Assessment of Knowledge and Skills test, ("TAKS")); (4) to significantly increase student performance on norm-referenced tests and assessments that are administered throughout the District; and (5) to plan and implement effective student-centered, non-academic activities that positively impact student learning. (Defs.' Ex. 190 at 68–74). In addition to the

---

**9.** While the issue of achievement gap was not designated by the parties as a "contested issue," there was much focus on the issue over the course of the hearing. Furthermore, the relevance of the achievement gap was considered at the time the Court granted Unitary Status. The Court will address the issue of the achievement gap as a separately contested issue.

**10.** The Learning Centers are: Pearl C. Anderson, John Henry Brown, George Washington Carver, Colonial, Paul L. Dunbar, Amelia Earhart, Thomas A. Edison Middle, Daniel "Chappie" James, Eladio R. Martinez, Joseph J. Rhoads, Charles Rice, Sequoyah, H.S. Thompson, Cesar Chavez, John F. Kennedy, and J.W. Ray. (Defs.' Ex. 190 at 4–67–D).

**11.** This Plan was referred to in the 1994 Order as a "Management Plan."

Goals, the Implementation Plan also provides for· specific program components. Recently, the District has updated the Implementation Plan to provide for a math demonstration teacher at each campus, and has added three more Learning Centers. (Defs.' Ex. 191). Other aspects of the Learning Center program include reduced pupil/teacher ratios, an extended school day, extensive voluntary before and after-school learning-support programs, retention bonuses for teachers who pledge to remain in the Learning Centers for a three-year period, and incentive bonuses for teachers who meet their performance goals. (Ison–Newsome, V. 4 at 196-197).

**b.** *Learning Center Performance:* At the hearing, the Court heard testimony regarding the District's compliance with the Court's requirements. Dr. David Bartz, an expert for Defendants, testified that the Learning Centers are meeting their goals. (Bartz, V. 3 at 79–80). Dr. Ison–Newsome testified that achievement test scores have steadily improved in the Learning Centers since 1997. (Ison–Newsome, V. 4 at 203–204). In 2002, students at the Learning Centers out-performed the District averages on the TAAS[12] test and matched the District averages on the Iowa Test of Basic Skills[13] for the first time since the inception of the Learning Centers in 1984. *Id.* at 204. Four of the sixteen Centers were deemed "exemplary" by the TEA in 2001–2002. *Id.* at 212. Exemplary status is the highest rating a school can receive based upon TAAS re-

sults; to qualify, 90% of the students from each ethnic sub-group at that school must pass all sections of the test. (Moses, V. 1 at 88; Webster, V. 2 at 47).

Plaintiffs presented evidence at the hearing that there are a few areas of concern with respect to the Learning Centers. The Implementation Plan provides guidelines for the selection of professional staff to work at the Learning Centers. (Defs.' Ex. 190, 191 at 211). The Implementation Plan suggests that teachers should have a "minimum of three years of experience with urban, diverse student populations" and that teacher absences during the current and previous school year should not exceed the District's average of the previous year. (Defs.' Ex. 190). The Court's External Monitor, Ms. Sandra Malone, testified that since 1997 there has been an increase in the number of teachers hired who do not meet these requirements. (Malone, V. 9 at 163). In the years following adoption of the Implementation Plan, the District introduced alternatives to these requirements. The newly adopted updates to the Implementation Plan require the District to "make every effort to ensure an experienced cadre of teachers, plus the best available who do not meet the minimum experience requirement." (Defs.' Ex. 191 at E–5). The Court heard testimony from Dr. Ison–Newsome that the Learning Centers have had to hire some teachers who do not meet their preferred profile due to the shortage of certified teachers both locally and nationally.

**12.** The TAAS test is the evaluation tool used by the Texas Education Agency ("TEA") to monitor school district performance. The test is criterion-referenced, meaning that the students are scored based upon their ability to complete tasks that are a part of the mandatory state curriculum.

**13.** The Iowa Test of Basic Skills or "ITBS" is a norm-referenced test. In norm-referenced tests, a student's score is compared to a

norm-reference group of people who have already taken the test. Scores for norm-referenced tests are given in terms of how a student scored compared to the norm group and are generally in percentile form. Because the ITBS is scored against a national-norm group, and is not based specifically upon the curriculum being taught in the DISD, it is generally considered to be a more stringent exam than the TAAS/TAKS. (Webster, V.1 at 214)

(Ison–Newsome, V. 5 at 97–98). When a Center brings these teachers into staff positions, they are required to attend the District's Alternative Certification programs as well as a full summer of training, monthly Alternative Certification training meetings, and various layers of learning center training. *Id.* at 98. Dr. Ison–Newsome testified that she has found that many of these Alternative Certified teachers are more effective than the experienced teachers as a result of their extensive training. *Id.*

Ms. Malone also testified that there were unexplained fluctuations in the amount of money allocated to the Learning Centers, and that the District was slow in facilities repairs at the Learning Centers from 1997–2000. (Malone, V. 9 at 166–167). There was no evidence to suggest that the Learning Centers were allocated less money than was required by the 1994 Order or that the District was singling out the Learning Centers for delayed repairs.

The Court finds that the DISD has complied with the Court's orders related to Learning Centers. The Learning Centers are a valuable tool in the District's efforts to increase minority achievement, and their programs appear to be particularly effective. Dr. Moses testified that the Learning Centers "are outstanding programs" that are "certainly worthy of replication." (Moses, V. 1 at 120). The Covenants also refer to the replication of successful Learning Center programs at other schools throughout the District. (Covenants, No. 7; Defs.' Ex. 33).

The Court commends the District, both on its compliance with the Court's Orders in this area and on its commitment to maintain and replicate the Learning Center programs. The Court relies on this commitment. Further judicial supervision of the Learning Centers is unnecessary.

### 2. Bilingual/ESL Programs

With the changing racial and ethnic composition of the student population of the District, the Bilingual/ESL program has become essential. The need for increased focus on multilingual education is underscored by some quite dramatic statistics. Currently, 53,053 students (approximately 32% of DISD's student body) are designated Limited English Proficient ("LEP"). (Gutierrez, V. 6 at 29, Defs.' Ex. 92). There are 73 languages spoken by students in the DISD. Of those students who speak a foreign language, 97% speak Spanish. (Gutierrez, V. 6 at 31).

**a. Bilingual/ESL Requirements:** The Judgment requires the District to provide Bilingual/ESL instruction programs that meet certain requirements. *See* Judgment at 21. Specifically, the District must identify LEP students, determine their language proficiency level, classify the students based upon the level of their English-speaking ability, notify parents of that classification, place the student in an appropriate instructional program and instruct them, check on student progress at regular intervals, provide staff development, provide for parental involvement, provide for recruitment of bilingual teachers, and regularly evaluate the program. The District must also comply with Federal and State mandates for Bilingual/ESL instruction.

**b. Performance:** Under the leadership of Ms. Gloria Gutierrez, Director of the Multi–Language Enrichment Program ("MLEP"), the District has made great strides in the multi-language arena. To comply with the Court's Orders, the District has initiated some unique multi-language programs. (Gutierrez, V. 5 at 224–5). The MLEP has "grown tremendously" in the last two years to meet this increased demand on District resources. (Gutierrez, V. 5 at 218). Ms. Gutierrez has developed

an MLEP Program Handbook ("Handbook") that comprehensively describes the MLEP program. (Defs.' Ex. 82). Dr. George Gonzales, an expert witness for Defendants, testified that the Handbook is "exceptional" and that he has never seen another document that was as "complete" or "well-done" as the Handbook. (Gonzales, V. 4 at 130).

*i. Elementary Programs.* The District's MLEP program at the elementary level can be broken down into a few principal components (Gutierrez, V. 5 at 223–225; Defs.' Ex. 82 at 6–16):

(1) *Alternative Modified Bilingual Education Program ("AMBEP").* The AMBEP provides instruction primarily in Spanish but provides some instruction in English. (Defs.' Ex. 82 at 6). Spanish-speaking LEP students at the Pre–Kindergarten ("Pre–K") through third-grade level are placed into this program. (Gutierrez, V. 5 at 223–224). At the third-grade level they are transitioned into an ESL program. *Id.*

(2) *ESL.* In ESL, the instruction is provided in English with a focus on second-language acquisition methods. (Defs.' Ex. 82 at 7). Some Spanish-speaking students at the Pre–K through third grade-levels are placed into ESL classrooms instead of AMBEP classes because of a shortage of bilingual instructors. *Id.* Students who speak a foreign language other than Spanish are also placed into ESL classes.

(3) *Newcomer Program.* The Newcomer Program is designed for recently-arrived immigrant students at grades 3–6 who are non-English speakers. The program uses a specialized approach to teaching English to these students with first-language support when it is available. *Id.*

*ii. Secondary School Program.* At the secondary school level (grades 7–12), the DISD has two principal programs: ESL and the English Language Institute ("ELI"). (Defs.' Ex. 82 at 20–23). The ESL program at the secondary levels is similar to the program at the elementary levels. The ELI is a program for all secondary school LEP students who have been in the country for less than a year and who score at a beginning level on an oral language proficiency exam. (Defs. Ex. 82 at 20). The ELI students receive specialized instruction to help them catch up on their language skills so that they can join the regular ESL program. (Gutierrez, V. 6 at 4).

*c. Other:* In addition to the variety of methods employed in MLEP, the magnitude of the District's multi-language program is also remarkable. In 2002–03 the District employed 2,321 teachers who were trained to deal with students who principally spoke a foreign language.[14] (Gutierrez, V. 6 at 31). Of the more than 150 elementary schools in the District, 99 offered bilingual programs and 52 offered ESL programs in 2002–03. *Id.* The District's newly developed Newcomer Program expanded from 17 campuses in 2001–02 to 29 in 2002–03. *Id.* Of the 29 high schools and 28 middle schools in the District, 42 have ESL programs. (Gutierrez, V. 6 at 32). The District has 263 ESL secondary teachers. *Id.* The DISD is establishing a centralized intake center that receives recent immigrant families, then assesses potential LEP students and provides assistance to immigrant parents. (Gutierrez, V. 5 at 219–220, V. 6 at 41). Finally, as of February 2003, only 2% of LEP students were not being served by the MLEP, a number which is principally the result of a lack of certified teaching staff, a problem that the DISD is working to improve through aggressive recruiting. (Gutierrez, V. 6 at 30, 37). The problem of

**14.** This number includes 912 bilingual teachers and 1,409 ESL teachers.

bilingual recruiting is not unique to Dallas, but rather is a serious national problem. (Gutierrez, V. 6 at 36).

**d.** *Areas of Concern:* Plaintiffs have several concerns with respect to multi-language education. First, Plaintiffs argue that students spend too much time in MLEP programs; the exit-levels are unsatisfactory. Second, Plaintiffs point to evidence that LEP students participate in special programs (Magnet schools, Talented And Gifted ("TAG"), Advanced Placement ("AP") and Pre–AP) in significantly lower proportions than do non-LEP students. Plaintiffs also point out that there are not enough bilingual teachers in the District to meet the student need.

In 2001–2002, more than half of LEP students at grades 5 and 6 had been in the DISD since their Kindergarten year. (Pls.' Ex. 2 at 2–17). At the secondary level, long-term LEP students (students who have been in LEP programs for 7 years or more) made up 38% of all those served by an MLEP program; 26% of those students have been in MLEP programs for more than 9 years. *Id.* at 2–18. Most of these students were U.S.-born. *Id.* The relatively long retention in LEP programs is a matter of concern to the Court. There is, however, positive evidence that these trends are changing. Dr. Gutierrez testified that in 2001–02 33% of LEP students in elementary schools exited the MLEP program. (Gutierrez, V. 6 at 34–35; Defs.' Ex. 92). That same year, 28% of secondary students exited the program. *Id.* at 35. Furthermore, exited LEP students received higher TAAS scores in reading, writing, and math than students in the Bilingual/ESL programs and outscored non-LEP students at grades 3 through 6. (Gutierrez, V. 6 at 24–25; Defs.' Ex. 86). The District takes seriously its responsibility to make the MLEP programs strong enough to prepare LEP students for mainstream education. (Gutier-

rez, V. 6 at 25). The results of the MLEP programs, as evidenced through the TAAS scores of exited students, are striking. The Court concludes that the District is working diligently to assure quality educational opportunities for LEP students. The length of a student's participation in LEP programming is not a matter covered by the Court's Orders nor is it of constitutional dimensions. While the District should make every effort to move students into mainstream education as quickly as possible, speed need not be emphasized at the expense of program quality.

Plaintiffs also point to relatively low representation of LEP students in Magnet, TAG, AP and Pre–AP programs. In 2000–01, only 0.7% of elementary LEP students and 0.8% of secondary LEP students were enrolled in Magnet schools. (Pls.' Ex. 5B at 31; Pls.' Ex. 5C at 30). Plaintiffs assert that TAG numbers are also relatively low: 8% of LEP elementary students were enrolled in TAG, with 5% of middle school LEP students participating in TAG programs in 2000–01. (Pls.' Ex. 5B at 31; Pls.' Ex. 5C at 30). LEP enrollment in TAG has grown since 2001. In fact, the Court heard testimony that there is some concern that LEP students are over-represented in TAG programs today. The TEA recommends that 10% of TAG program participants be LEP students, and the DISD percentage of LEP students in TAG this school year is 12.5%. (Oliphant, V. 5 at 199). The District is also developing a Spanish-language TAG program that it intends to implement next school year, an action that the Court commends. *Id.* at 203–04. Plaintiffs also point out that less than 10% of LEP students participated in Pre–AP or AP courses in 2000–01. AP and Pre–AP are voluntary programs. Students must opt to take these more advanced classes. There was no evidence presented at the hearing to suggest that LEP students were being excluded from

these programs, or denied information about these programs, based upon racial/language status.

Finally, Plaintiffs point to the insufficient number of bilingual teachers in the District. As discussed above, this is not a new problem; nor is it unique to the DISD. There is a serious national shortage of certified bilingual teachers. (Gutierrez, V. 6 at 36). The District has recently begun some creative recruiting methods in an attempt to find more qualified instructors, including recruiting certified teachers from Mexico through programs at four Mexican universities, participating in the Region IV Bilingual Initiative, and the DISD/SMU Bilingual Teacher Initiative, in addition to traditional recruiting methods and alternative certification programs. (Gutierrez, V. 6 at 37–39).

The Court concludes that the DISD has complied with, and will continue to comply with, the Court's Orders related to Bilingual/ESL programs. (*See* Covenants, Nos. 6, 9; Defs.' Ex. 33). Further judicial supervision is unnecessary.

### 3. *Early Childhood Education*

There is substantial evidence, and the parties agree, that the early years of a child's education are extremely important in terms of performance over a student's academic career. In keeping with the importance of early childhood education, the Judgment established an Early Childhood Education ("ECE") program to maximize benefits to young children (now considered Pre–K through Third-grade). The Judgment required a comprehensive program of instruction in all areas based upon the developmental needs of young children and the District's curriculum. *See* Judgment at 19. The approach was to be diagnostic-prescriptive, meaning that educators would determine the needs of the student and then develop an approach that would meet those needs. *Id.* The Judgment also sets

out specific requirements for curriculum implementation: there should be (1) small group and individualized instruction; (2) principal and staff implementation of the curriculum at each school, with parent-advisory committee involvement; (3) 1 adult for each 10 children; (4) continuing staff development to meet ECE needs, with parental involvement; (5) cultivation of effective community partnerships; (6) maximization of parental involvement in planning, reinforcing and complementing their children's learning; and (7) the local ECE Center as the administrative units which have primary responsibility for delivering quality learning experiences. Judgment at 20. In 1994, the Court held that the District was substantially complying with the ECE directives, but directed the District to increase its efforts to achieve the goal of one adult for every ten K–3 students. 1994 Order at 467.

At the hearing, the Court heard considerable testimony on the issue of ECE compliance. Dr. Vicki Aguirre–Cox testified that the DISD is using small-group instruction, principal and staff planning, staff development programs, effective partnerships with community groups, and efforts to maximize the involvement of parents in planning, reinforcing, and completing their children's learning. (Cox, V. 4 at 106–7). The District uses the Language Enrichment Activities Program ("LEAP") curriculum for pre-schoolers, providing integration with Dallas Head Start programs which utilize the same curriculum. (Cox, V. 4 at 97). The DISD also is part of the Dallas Early Childhood Reading Initiative Coalition. *Id.* DISD offers "Mixed Age" programs (which "mix" together students from two grades in the same classroom) and "Looping" (where a teacher stays with the same group of children from kindergarten through first or second grade) programs which provide educational alternatives for young students. (Walker, V. 4 at

25). The District also offers a Parent and Family Literacy program which targets the literacy skills of both the student and parents at the same time. (Walker, V. 4 at 25–6). The Parent and Family Literacy program is offered on seven sites in DISD and was continued after federal funding ran out. *Id.*

DISD utilizes the recognized AVANCE program as an outreach tool to Latino families with young children. (Cox, V. 4 at 99). DISD also operates its bilingual education program at the Pre–K level. (Walker, V. 4 at 31). The operation of a bilingual education program before students even begin school is unique. (Walker, V. 4 at 31).

DISD provides ongoing staff development on various subjects focused on the early childhood years. (Defs.' Ex. 55). The District is also focused on continuing its staff-development processes as well as ensuring that parents are aware of what is going on in their children's educations and also of what they can do to help them. (Neely, V. 3 at 41). Beginning in the fall of 2003, the District will begin using a new assessment device (Dial–3) to diagnose reading problems as early as the first month of Pre–K. (Neely, V. 3 at 41).

There is constant collaboration among the Directors of the Reading Department, MLEP. and the ECE Program. (Steerman, V. 6 at 76–77). Dr. Moses has directed the three directors to work closely together to develop a comprehensive professional development program. *Id.* The District has assigned Campus Facilitators to each elementary school with an ECE program to assist principals with program implementation.[15] The Campus Facilitators are Master early childhood teachers. (Steerman, V. 6 at 98). The Campus Facilitators are also full-time instructors who receive limited extra compensation for their work as Facilitators.[16] There are five ECE specialists, lead Reading teachers and lead Math teachers, as well as lead teachers in other subjects, all of whom provide services for the District's elementary campuses. (Steerman, V. 6 at 135). Principals are responsible for program implementation on their campuses (Steerman, V. 6 at 146). The District's curriculum for grades Pre–K through 3 has undergone extensive reworking in the last several years, and is not fully complete; the expanded curriculum for reading/language arts will be completed in June 2003. (Neely, V. 3 at 40). The Court also heard testimony that the lack of an expanded curriculum for reading/language arts was not a matter of great concern because of the strength of the program selected by the District in this area.[17] *Id.* The External Auditor testified that the majority of schools in the DISD used small-group instruction from 1997–2000, and that there has been good progress at the administrative level in the DISD toward meeting all seven conditions of the Court's Order. (Malone, V. 9 at 206–7). Ms. Malone also found that information on the components of ECE is being distributed appropriately from the District to each campus. (Malone, V. 9 at 160).

Plaintiffs point to several areas of concern with respect to ECE:

15. Campus Facilitators were in place beginning in school year 2001–2002. (Steerman, V. 6 at 146).

16. Those duties include attending a two-hour training course and preparing ECE training for their campus. The District provides agendas and handouts and the on-campus training occurs during contract hours. (Steerman, V.6 at 148).

17. The District uses a reading/language arts program called "Open Court." (Neely, V. 3 at 40).

**a.** *Administrative Units:* Plaintiffs argue that component seven of the ECE requirements is not being met. Component seven requires "use of the local Early Childhood Education Center as the administrative unit which has primary responsibility for delivering quality learning experiences." Judgment at 20. Plaintiffs focus on the phrase "administrative unit" and argue that there must be a *separate* administrative unit in each elementary school to focus on the Pre–K through Third grades with the Fourth through Sixth grades administered separately. Under the current ECE program, school principals have primary responsibility for everything that happens in their schools including ECE implementation. ECE Campus Facilitators assist the principal with ECE compliance issues. (Steerman, V. 6 at 146). While the principal is primarily accountable for ECE performance, the Campus Facilitators, all of whom are Master teachers, can be powerful aids to the school principals in ensuring that the needs of these youngest children are being met. While Plaintiffs' expert, Dr. Rosie Sorrells, asserts that this program is non-compliant with the Judgment, the current approach is not unlike the program in place in 1990 when Dr. Sorrells was the Director of Early Childhood Education in the DISD. (Sorrells, V. 9 at 16–17).

At their inception in 1976, the ECE Centers were developed to comprehensively address needs of the District's youngest students. Some ECE Centers were stand-alone K–3 schools and some ECE Centers were housed in K–6 schools. (Sorrells, V. 9 at 16–17). In requiring that the local ECE Center be the administrative unit with primary responsibility for delivering quality learning experiences, the Court was emphasizing that it was *the school itself* and not the District that was responsible for student learning in these programs. The current accountability program

in the DISD for ECE meets these requirements.

**b.** *Other ECE Compliance Issues:* Plaintiffs argue that the District has not fully complied with all ECE requirements and point to the testimony of the Court's External Auditor to support their contention. Ms. Malone testified that she was unable to find the presence of all seven Court-ordered components of ECE on any campus she visited until 2002. (Malone, V. 9 at 150). In 2001–02, she found that many schools were not operating with all seven components. *Id.* at 158. The Court heard testimony from the External Auditor, however, that there has been good progress at the District level toward implementing all seven components. *Id.* at 220. Moreover, there is no evidence before the Court that any schools are currently non-compliant with all ECE requirements.

Plaintiffs are also concerned that the newly-redeveloped ECE program has not been in place for a sufficient period of time for the Court to find that the District is in substantial compliance with this portion of the Court's Orders. In 1997, the Court directed a special audit to be conducted on Early Childhood by the External Auditor. (Pls.' Ex. 40; Malone, V. 9 at 140). That audit did not find evidence of any ECE program in the District. (Malone, V. 9 at 143). The new ECE program was developed in 2000–01, and in 2001–02 the External Auditor began to see varying degrees of implementation on campuses. (Malone, V. 9 at 152–53). At the time of the hearing, the Auditor had not completed her research for the 2002–03 year.

The Court finds that although the DISD has not in the past fully complied with the ECE portion of the Court's Orders, the District has made mighty efforts beginning in 2001 to improve performance in this area. It is clear that there has been tre-

mendous progress since Dr. Moses became Superintendant and that he and his staff have vigorously sought to achieve compliance. While the ECE program in its current form is relatively new, the Court finds that the District is making good faith efforts to comply fully, and is in substantial compliance at this time despite any deficiency in the past.

The Court notes with satisfaction that one of the Covenants addresses ECE. (Covenants, No. 3; Defs.' Ex. 33). Covenant number 3 promises that the District will maintain a strong ECE program at all campuses that house children in Pre–K through third grade, and lays out the elements of such a program. The Court relies upon this continuing commitment.

The Court notes also that this portion of the Court's Orders is not an issue of constitutional dimension. Continued Court supervision of ECE is not needed. *See Flax v. Potts*, 915 F.2d 155, 159 (5th Cir. 1990) ("[t]o continue supervision once [constitutional] wrong is righted...effectively changes the constitutional measure of the wrong itself; it transposes the dictates of the remedy for the dictates of the Constitution.")

Further judicial supervision is unnecessary.

### 4. *Magnet Schools*

Magnet schools attract a diverse student population to centrally-located schools for career, vocational, and other specialty programs. *See Tasby*, 520 F.Supp. at 745. This Court has endorsed Magnet schools since the 1976 Judgment. *See Tasby*, 412 F.Supp. at 1205; *Tasby*, 520 F.Supp. at

747; 1994 Order at 464. Section V of the Judgment contains detailed directives to the DISD regarding the operation of Magnet schools; these were supplemented by the 1994 Order. *See Judgment* at 12–19; 1994 Order at 464–466. The DISD Magnet program is made up of both whole-school Magnets and school-within-school Magnet programs. There are 9 whole-school Magnets (including the 6 Magnet programs housed at Yvonne A. Ewell Townview Center Magnet).[18] Additionally, there are Academy programs serving middle school students and Vanguard programs to serve elementary school students.

At the hearing, the District produced evidence to show compliance with the Court's Orders:

**a. *Ethnic Ratios:*** In 1993, the Court set the ratios for Magnet school admission to 32% African American, 32% Latino, 32% Anglo, and 4% Other. Order of September 24, 1993. Of the total enrollment in the Magnet, Vanguard and Academy schools, African Americans account for approximately 41%, Latinos 40%, Asians and Native Americans 3%, and Anglos 16%. (Defs.' Ex. 24 at 27).

**b. *Academic Performance:*** Overall, the Magnet Program has 12 Exemplary Schools, and Four Recognized Schools. (Bailey, V. 5 at 151). Magnets also have a 90% to 100% passing rate on the TAAS, which is above the District's passing rates and Magnet students have better scores than non-Magnet students on the Stanford 9. (Bartz, V. 3 at 93–4).

---

**18.** The stand-alone Magnets are Booker T. Washington High School for the Performing and Visual Arts, James Madison JROTC Telecommunications Magnet, and Lincoln Humanities/Communications Magnet. The Magnets housed at the Yvonne A. Ewell Townview Center Magnet are: the Business and Management Center, Education and Social Services Magnet, the Health Professions Magnet, the Public Services, Government, Law, and Law Enforcement Magnet, the Science and Engineering Magnet, and the Talented and Gifted Magnet. (Defs.' Ex. 128).

**c.** *Academic Programming:* The District has implemented a vertical curriculum alignment, where certain middle schools "feed" students into Magnet secondary programs. (Bartz, V. 3 at 87). This vertical alignment allows for continuity in curriculum between middle and high school for students with specialized interests. Recently, the District voluntarily placed coordinators in each Vanguard and Academy school-in-school program. These Magnet coordinators dedicate all of their time to working with the Magnets. (Bartz, V. 3 at 92–3).

**d.** *Student Recruitment:* Each year the District holds an informational fair at each middle school to inform students of the Magnet program. (Bailey, V. 5, at 148). Students are selected to attend a Magnet school by the screening committee for that school. (Bailey, V. 5 at 143–4). Screening committees are made up of teachers, members of the community, and parents, who screen the applicants and make recommendations on placement. *Id.* Screening committee members attend training on how to review the applications to ensure that each student's application receives a fair review. *Id.* It appears that the District's Magnet programs have maintained their drawing power over time. (Bartz, V. 3 at 94).

**e.** *Monitoring:* Each principal at a Magnet school receives a guidebook related to compliance with the Court's Orders, and compliance issues and concerns are addressed at monthly meetings and throughout the year with the District's Magnet team. (Bailey, V. 5 at 150–1). The teams focus on obtaining documentation from the schools regarding compliance. *Id.* at 151. The internal compliance department also monitors compliance with the Court's Orders. *Id.* The District is also taking steps to evaluate and improve the Magnet programs. (Bartz, V. 3 at 98). For example, the District commissioned a large-scale external evaluation of the Magnet Program that was completed in May. (Francois, V. 2 at 194–95). The District's decision to submit to an external Magnet Effectiveness Evaluation Study ("Magnet Study") represents a proactive approach to continually improving these programs. (Bartz, V. 3 at 98). After receiving the external report, the District performed its own evaluation to determine which portions of the external evaluation to implement. (Defs.' Ex. 249, 249–A). The District agreed with the vast majority of the recommendations made in the Magnet Study. *Id.*

**f.** *Areas of Concern:* Plaintiffs' principal concern regarding the Magnet program centers around the recent Magnet Study and the subsequent internal evaluation. Plaintiffs state that "many of those recommendations... [including] those agreed to by the Administration will take up to three (3) years or more for their implementation." (Pls.' Second Supplemental Proposed Findings of Fact at 7). Plaintiffs argue that the effectiveness of Magnet programs cannot be determined until all of the changes suggested by the Magnet Study and agreed to by the DISD have been fully implemented. *Id.* The Court disagrees. The Judgment requires that the District "review the effectiveness of all magnet programs" and "determine and implement appropriate changes...to ensure that all magnet schools are effective as educational programs and as desegregation tools." Judgment at 15. The District has reviewed the effectiveness of the Magnets and determined appropriate changes. While implementation of these recently-determined changes is not yet complete, such implementation will never be fully complete. "Effectiveness" is a moving target that requires constant adaptation. The DISD has substantially complied with the Court's requirements in the area of Magnet Programs. Furthermore,

this issue is not one of constitutional proportions. *See Flax*, 915 F.2d at 159. Further judicial supervision in this area is not warranted.

### 5. *Other Achievement–Based Remedies*

The parties are also in disagreement over whether the District is in compliance with Court Orders in the areas of TAG, AP and Pre–AP programs. In the 1994 Order, the Court held that these programs were working well but cautioned that the programs should not become tools by which resegregation entered the classrooms of desegregated campuses. 1994 Order at 467. The Court further required the District to closely monitor the participation of minority students in these programs. Each of these programs provides advanced academic opportunities to students.

**a. *Advanced Placement:*** AP classes are academically challenging courses taken by students preparing for college. The AP curriculum used by the District is based on a national curriculum provided by the College Board. (Oliphant, V. 5 at 174). DISD's participation in this program is impressive. The DISD offers AP courses in 19 areas to prepare for 35 AP exams, which are offered by the College Board and can provide college credit. (Defs.' Ex. 107). The Pre–AP curriculum is designed by the District to prepare students for AP classes. *Id.* Students self-select themselves into the AP and Pre–AP programs. *Id.* The District promotes the availability, benefits and advantages of its AP Program through the use of brochures that are printed in both English and Spanish. (Oliphint, V. 5 at 174, 180; Defs.' Ex. 107). All AP teachers attend a 5–day summer training program provided by the College Board. (Oliphant, V. 5 at 174–5). The Advanced Academic Services Department ("AASD") staff also provides training to teachers and administrators to ensure that all are aware of what is expected in AP courses. *Id.* at 175. The AASD staff trains school counselors to inform students of the advanced academic opportunities available in the DISD. *Id.* AP teachers are charged with building vertical alignment between AP and Pre–AP courses on each campus. *Id.* The AASD provides Saturday District-wide tutoring sessions in AP course topics as extra preparation for the AP exams. *Id.* at 176. The AASD also provides PSAT preparatory courses, Kaplan SAT preparatory courses (at no charge), and a piece of software called "AP Potential" that reviews student's PSAT profiles and suggests which AP courses that student should enroll in. *Id.* at 178. The District has an "AP Incentive Program" funded by private and corporate donors that provides financial incentives to students who pass AP exams and their teachers. (Oliphant, V.5 at 184). Since the Incentive Program's inception in 1996, the number of students receiving a 3 or better (generally considered the minimum score to receive college credit) on AP exams in Math, Science, and English has increased dramatically from 361 students in 1996 to 1047 students in 2002. (Defs.' Ex. 106 at 3; Oliphant V. 5 at 184–5). The AP Incentive Program is available in 15 high schools. The District's per capita passing rate of its AP students with scores of 3 or above on Math, Science, and English AP exams surpasses both statewide and national averages by an almost 2 to 1 margin. (Defs.' Ex. 106 at 4).

Plaintiffs have expressed concern that minority representation in the District's AP and Pre–AP programs is not proportional to the percentages that minorities make up of the entire District. In 2002–03, African American students made up 38.1% of the District's high school students, and 37.94% of the AP population. Anglo students made up 8.6% of the total population and 21.25% of the AP population. Latino students made up 51.6% of

the total population and 36.73% of the AP population. (Pls.' Ex. 1 at 6; Pls.' Ex. 1F, part II at 25). In the five high schools with more than 20% Anglo population, Plaintiffs are particularly concerned about apparent over-representation by Anglo students in AP programs. *See* Pls.' Supplemental Proposed Findings at 35. The AP and Pre–AP programs are voluntary, *i.e.* optional. Students must self-select themselves into these programs; they are not required to participate by the District, nor are they selected by the District for these programs. As Ms. Suzee Oliphant, director of AASD testified, "it's kind of like putting your life in the hands of a 17 year old to make this choice." (Oliphant, V. 5 at 179). While it appears that in terms of District-wide numbers there is an under-representation of Latino students and an over-representation of Anglo students, there is no indication that these numbers have been purposefully, or negligently, skewed by the DISD. The DISD trains guidance counselors to inform students of the availability and benefits of these programs, and provides documentary support in the form of pamphlets available in both English and Spanish to explain the AP/Pre–AP program. Furthermore, the number of minority students participating in AP/Pre–AP classes has dramatically increased in recent years. In 2002–03, 75% of students participating in AP/Pre–AP courses were African American or Latino. (Oliphant, V. 5 at 212). Ms. Oliphant also testified that the District's goal was to ensure that all students receive all of the information about AP programs, and that their parents receive that information, so that they have the choice of opting into these classes. (Oliphant, V. 5 at 208–9). The Court finds no evidence that AP courses are utilized by the District as a tool for classroom segregation.

The Court believes that all students wishing to take advanced courses should have access to them, and that limiting AP enrollment to ensure proportional representation by each racial group would be short-sighted. As Ms. Oliphant suggests, the more students who enroll in AP courses, the better. (Oliphant, V. 5 at 208; stating that she could not agree to the use of the term "over-representation" because she wanted all students to enroll). While the "over-representation" on several campuses of Anglo students in AP classrooms is noted, there is no evidence before the Court that any disproportionate representation is the result of District action or inaction.

Plaintiffs are also concerned about the percentages of minority students taking and passing the AP exams. In 2002, DISD students passed 1689 exams, with African American and Latino students passing 890, and Anglo students accounting for 799 of those passing scores. (Defs.' Ex. 34 at 63). This was the first time ever that African American and Latino students passed more AP exams than Anglo students did in the DISD. *Id.* Like enrollment in the AP courses, the decision to take the AP exam rests with the student and cannot be coerced by the District. There is financial assistance for those students who are unable to afford the cost of the exam, as well as incentives for passing scores which were referenced above. (Oliphant, V. 5 at 212; *see* AP Incentive Program discussion *supra*). Plaintiffs argue that since minority students make up such a large majority of students enrolled in the AP/Pre–AP courses, they should be a larger percentage of the passing scores. However, the decision to take the AP exam is within the control of individual students and not the DISD. There is no evidence before the Court that minority students are dissuaded from taking AP exams, or that the District in any way treats minority AP students differently from Anglo AP students with respect to testing. Finally,

regardless of whether a student chooses to take the AP exam, the student will benefit from enrollment in the AP course itself. (Oliphant, V. 5 at 200).

**b.** *Talented And Gifted:* Plaintiffs also argue that the TAG program is an area of concern. TAG is a program established for students who show the potential to perform at an exceptionally high level of accomplishment when compared to other children of the same age, experience and environment. (Oliphant, V. 5 at 172). There are 28 TAG programs in middle schools and more than 150 elementary TAG programs. (Pls.' Ex. 4F). Students are selected to participate in TAG at the campus level. A student can enter the applicant pool either by scoring at or above the 80th percentile on a nationally-normed exam (*e.g.,* ITBS), or by recommendation by a teacher, parent, or the student himself. After nomination, one of several evaluative tests is given to the student and a portfolio of the student's work is gathered. Then a campus-based committee, made up of an administrator, the TAG teacher, an MLEP teacher, and various other teachers, makes a determination as to each student. (Oliphant, V. 5 at 195–8). District-wide the percentages of students from each racial group in TAG closely resembles the total enrollment of the DISD: African Americans make up 35% of TAG; Latinos, 52%; Anglos, 10%; Asians, 2%; and Native Americans, 1%. (Oliphant, V. 5 at 198). Plaintiffs' concerns about TAG center around LEP-student participation in the TAG program; this is addressed above. *See* Bilingual/ESL discussion *supra.* There is no evidence of racial discrimination in the TAG program.

Plaintiffs' concerns about the District's non-compliance in the TAG, AP and Pre–AP programs are not supported by the evidence. The Court finds that the DISD has substantially complied with, and will continue to comply with, the Court's Orders relating to TAG, AP and Pre–AP. (*See also* Covenants, No. 6; Defs.' Ex. 33).

**6.** *The Achievement Gap*

In the 1994 Order, the Court indicated that it might revisit the issue of the achievement gap between minority and majority students when it considered dismissal. 1994 Order at 477. At the recent hearing, the parties presented testimony about achievement generally, and the achievement gap in particular.

The threshold issue is whether consideration of an achievement gap is relevant to the question of dismissal. As early as 1986, the Court stressed to the parties that achievement disparities between minority and majority students were only relevant to the extent they were related to prior unconstitutional segregation. *Tasby,* 630 F.Supp. at 600 (1986); *see also Tasby v. Wright,* 713 F.2d 90, 96 (5th Cir.1983). To the extent that a current achievement gap can be linked to the prior *de jure* segregation system, it must be eliminated to the extent practicable. *Bd. of Educ. of Oklahoma City Pub. Schools v. Dowell,* 498 U.S. 237, 249–50, 111 S.Ct. 630, 112 L.Ed.2d 715 (1991). To the extent the achievement gap is caused by other factors it is outside the reach of the Court's authority. *Missouri v. Jenkins,* 515 U.S. 70, 102, 115 S.Ct. 2038, 132 L.Ed.2d 63 (1995). "Insistence upon academic goals unrelated to the effects of legal segregation unwarrantably postpones the day" when a school district can operate on its own. *Id.* Courts of appeal confronted with the issue of achievement gap have declined to consider the achievement gap as a vestige of prior discrimination or as evidence of current discrimination.[19] There was no evidence

19. *See Belk v. Charlotte Mecklenburg Bd. of Educ.,* 269 F.3d 305, 330 (4th Cir.2001); *U.S.*

presented to the Court that the remaining achievement gap in DISD is linked to the prior *de jure* segregation system.

Even if the achievement gap were relevant to the question of dismissal, the Court notes that the District has maintained a remarkable upward trend in overall student achievement since it achieved unitary status in 1994. Anglo performance on the TAAS reading section has risen from an 80.7% passing rate to 93.9% (net 13.2% gain). Latino students have improved from a 59.9% passing rate to 80.5% (net 20.6% gain), and African American students have improved their passing rate from 52.2% to 82.9% (net 30.7% gain). (Defs.' Ex. 34 at 31). The trend is similar for math: Anglo students have improved from 68.1% to 93.5% (net 25.4% gain); Latino students from 45.8% to 85.1% (net 39.3% gain); and African American students from 37.2% to 82.8% (net 45.6% gain). (Defs.' Ex. 34 at 32).

The achievement gap has also narrowed considerably in the last nine years. In 1994, there was a 20.8 % difference in the pass rates of Anglo and Latino students on the reading portion of the TAAS and a 28.5% gap between Anglo and African American students. (Defs.' Ex. 34 at 31). Today the gap is 13.4% between Anglo and Latino students and 11% between Anglo and African American students. *Id.* In math, the narrowing is even more striking. In 1994, the gap between Anglo and Latino students on the math portion of the TAAS was 22.3% and the gap between Anglo and African American students was 30.9%. (Defs.' Ex. 34 at 32). Today the gap between Anglo and Latino students has narrowed to 8.4% and between Anglo and African American students to 10.7%. *Id.* The gap is closing and student achievement has dramatically improved.

The Court also heard testimony from Defendants' expert Dr. Robert Green that DISD has made "tremendous strides" toward closing the achievement gap over the last nine years. (Green, V. 3 at 159). Furthermore, when the DISD is compared to other similar large metropolitan school districts, Dallas significantly outperforms the other cities with respect to achievement gap. (Green, V. 3 at 157–8; Defs.' Ex. 68 at 30–31). In some cases, the gap in comparable school districts is more than double the size of the DISD gap. *Id.*

In 1994, the Court held that it was "unable to find that the achievement gap in the DISD is a vestige of the prior segregated school system." 1994 Order at 477. No evidence was presented at the hearing that would lead the Court to change that conclusion.

The achievement gap is not a factor for the Court to weigh in considering dismissal.

### III. Conclusion

■ With today's ruling the Court ends the lawsuit filed in 1970 by the courageous African American Plaintiff, Sam Tasby. In the 33 years since the suit was filed the Dallas Independent School District has accomplished much. Although in past years it has seemed that the School District lacked determination to comply with Constitutional requirements and Court orders, that is no longer the case.

The segregation prohibited by the United States Constitution, the United States Supreme Court, and federal statutes no longer exists in the DISD. The School Board provides constructive and knowledgeable oversight. The Superintendent, Dr. Mike Moses, and his able staff provide strong and progressive leadership. Dedicated teachers provide the opportunity for

*v.City of Yonkers*, 197 F.3d 41, 54 (2d Cir. 1999) *cert. denied* 529 U.S. 1130, 120 S.Ct. 2005, 146 L.Ed.2d 956 (2000); *People Who*

*Care v. Rockford Bd. of Educ.*, 111 F.3d 528, 537 (7th Cir.1997).

quality education to pupils of all races, ethnicities, and economic levels. Students have educational opportunities not available when this lawsuit began—Magnet Schools, Learning Centers, exemplary bilingual educational programs, and an emphasis on early childhood education.

Yet, as Superintendent Moses stressed in his testimony, much remains to be done; there is no room for complacency. The impressive favorable trends in all areas of student achievement and in closing the achievement gap must continue. The current emphasis on Early Childhood Education must continue, and the District must adhere to the Covenants and Commitments adopted by the Board and relied on by the Court in reaching its decision today.

In short, the DISD is a good urban school district—better than is generally recognized—and it is steadily improving. It deserves—indeed, must have—the constant support of all elements of the Dallas community. With that support DISD will soon be a superior school district and will rank with the best urban school districts in the United States.

During this litigation the Court and the parties have been fortunate to have the services of experienced and capable lawyers—Mr. Cloutman for the Plaintiffs, and Mr. Thomas (joined recently by Mr. Ronquillo) for the School District. The Court is particularly grateful for the careful and constructive work of the External Auditor, Ms. Sandra Malone and her predecessor, Dr. Donald Hood.

Judgment will be entered in accordance with this Opinion. The Court will confer with counsel about the date of entry of the Judgment.

SO ORDERED.