Daniel, Dinah and Deanna McFADDEN, minors, by their parent and next friend, Tracy McFadden; Karen, Rodolfo and Kiara Tapia, minors, by their parent and next friend, Mariela Montoya; Jocelyn Burciaga, minor, by her parent and next friend, Griselda Burciaga; and Kashmir Ivy, minors, by their parent and next friend, Beverly Ivy; Kristianne Sifuentes, minors, by her parent and next friend, Irma Sifuentes, Plaintiffs,

v.

**BOARD OF EDUCATION FOR ILLINOIS SCHOOL DISTRICT U-46, Defendant.**

No. 05 C 0760.

United States District Court, N.D. Illinois, Eastern Division.

July 9, 2013.

Alonzo Rivas, Mexican–American Legal Defense And Educational Fund, Carol Rose Ashley, Kathleen Marie Mangold–Spoto, Rafael A. Vargas, Robert C. Howard, Ronald L. Futterman, Futterman Howard Ashley Watkins & Weltman, P.C., James Bradtke, Soule, Bradtke & Lambert, Paul Strauss, Chicago Lawyers' Committee for Civil Rights, Steven Paul Schneck, Robert D. Allison & Associates,

Stewart M. Weltman, Stewart M Weltman, LLC, Chicago, IL, Venita Hervey, Law Office of Venita Hervey, Rockford, IL, William W. Thomas, Behn & Wyetzner, Chtd., Evanston, IL, for Plaintiffs.

Christopher Allen Lott, Maree F. Sneed, Hogan Lovells LLP, Washington, DC, Patricia J. Whitten, Edward Nathan Druck, Jennifer Ann Smith, Michael Joseph Hernandez, Franczek Radelet P.C., Chicago, IL, John W. Borkowski, Hogan Lovells US LLP, South Bend, IN, for Defendant.

## MEMORANDUM OPINION AND ORDER [1]

ROBERT W. GETTLEMAN, District Judge.

After eight years of litigation, 27 days of trial to the bench on the issue of liability, and extensive post-trial briefing, this case boils down to four basic questions:

(1) Do the named plaintiffs have standing?

(2) Did the 2004 student assignment plan by defendant School District U–46 (the "District") discriminate against Minority Students [2] by concentrating inferior mobile classrooms ("mobiles") at Minority Schools?

(3) Does the English Language Learners ("ELL") program established by the District violate the Equal Education Opportunity Act, 20 U.S.C. § 1701 et. seq.

(4) Does the District's gifted program unlawfully discriminate against Minority Students?

Based on the evidence presented at trial, the court answers these questions:

(1) Yes.

(2) No.

(3) No.

(4) Yes.

The history of this litigation is tangled and protracted, with plaintiffs shifting their claims and emphasis a number of times during the course of discovery and motion practice.[3] Although fact discovery closed in 2009 and expert discovery closed in 2010, the trial of this case was delayed by motions to dismiss, for summary judgment and class certification, as well as numerous pretrial motions, disputes concerning the qualifications of plaintiffs' experts, and disputes occurring during the trial itself.[4] While the court appreciates the difficulties and challenges confronted by counsel throughout this case, it is unfortunate that the parents and children

---

[1]. The court adopts and incorporates the parties' post-trial Stipulation of Uncontested Facts (Doc. 757); which is appended hereto. This opinion constitutes the court's Findings of Fact and Conclusions of Law as required by Fed.R.Civ.P. 52(a)(1). The opinion contains both findings of fact ("Findings") and conclusions of law ("Conclusions"). To the extent any Findings may be deemed conclusions of law, they shall also be considered Conclusions. To the extent that any Conclusions may be deemed findings of fact, they shall also be considered Findings. See Miller v. Fenton, 474 U.S. 104, 113–14, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985).

[2]. As used herein, the term "Minority Students" refers to Hispanic and African American students; the term "Minority Schools" refers to schools that have more than 50% Hispanic or African American students.

[3]. As the District points out, plaintiffs have dropped a number of claims during the course of this litigation, including issues involving assignments to non-neighborhood schools, transportation, and special education.

[4]. The testimonial portion of the trial did not conclude until September 24, 2012, and the final (105 page) post-trial brief was not filed until March 15, 2013. Supplemental authority with accompanying briefs were filed in June 2013.

affected, not to mention the professional staff of the District, have had to wait so long to have this matter brought to a point of decision.

To avoid prolonging the length of this opinion[5], the court refers to its previous opinions and orders,[6] and will deal with the four issues presented by the trial.

## I. *Standing*

As it has throughout this litigation, the District challenges the named plaintiffs' standing to bring their claims, asserting that none of them have suffered an injury in fact. The court has rejected this argument four times (Docs. 29, 70, 96, 537), and does so again.

■ To establish standing, plaintiffs must show: (1) injury in fact, meaning an invasion of a legally protectable interest that is concrete and particularized, actual or imminent, and not conjectural or hypothetical; (2) a causal connection between the injury and the conduct complained of such that the injury is fairly traceable to defendant's actions; and (3) that a favorable decision is likely to redress the injury. *Tobin for Governor v. Ill. State Bd. of Elections*, 268 F.3d 517, 527–28 (7th Cir. 2001) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); *Sierakowski v. Ryan*, 223 F.3d 440, 442–43 (7th Cir.2000)). Abstract injury is not enough to establish injury in fact; the plaintiffs must establish

that they have sustained or are immediately in danger of sustaining some direct injury. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 101–02, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983); *Tobin*, 268 F.3d at 527–28.

■ In a putative class action, each named plaintiff must allege an injury in fact. *See Gratz v. Bollinger*, 539 U.S. 244, 289, 123 S.Ct. 2411, 156 L.Ed.2d 257 (2003) (The fact that a "suit may be a 'class action ... adds nothing to the question of standing, for even named plaintiffs who represent a class 'must allege and show that they personally have been injured, not that the injury has been suffered by other, unidentified members of the class to which they belong and purport to represent.' ") (citations omitted); *Payton v. County of Kane*, 308 F.3d 673, 682 (7th Cir.2002) ("Standing cannot be acquired through the backdoor of a class action.") (citing *Allee v. Medrano*, 416 U.S. 802, 828–29, 94 S.Ct. 2191, 40 L.Ed.2d 566 (1974) (Burger, C.J., dissenting)). And, as the District points out, general allegations that suffice to allege standing at earlier stages of the litigation are insufficient to prove standing once a case has gone to trial. At that point, standing must be "supported adequately by the evidence adduced at trial." *Lujan*, 504 U.S. at 561, 112 S.Ct. 2130.

As in its previous motions, the District argues that plaintiffs have failed to establish standing because none of the named plaintiffs have suffered any of the harms

---

5. This opinion addresses the evidence and issues the court finds to be dispositive on the question of liability. The fact that it does not address every argument and point raised by the parties at trial and in their post-trial submissions should not be taken as an invitation to file yet more briefs or motions to reconsider. This is the court's final word on liability, and the only issues remaining are the remedy for the constitutional and statutory violations in the District's gifted program for elementary schools, and attorney's fees.

6. *McFadden v. Bd. of Ed. for Ill. Sch. Dist. U–46*, 2006 WL 681054 (N.D.Ill. Mar. 13, 2006); (Class Certification I). *McFadden v. Bd. of Ed. for Ill. Sch. Dist. U–46*, 2006 WL 6284486 (N.D.Ill. Oct. 3, 2006) (motion to dismiss second amended complaint). *McFadden v. Bd. of Ed. for Ill. Sch. Dist. U–46*, 2008 WL 4877150 (N.D.Ill. Aug. 8, 2008); (Class Certification II).

that they attempted to establish at trial. Specifically, according to the District, the evidence established that none of the named plaintiffs attended an overcrowded school and, in any event, there was no evidence that the use of mobiles created any harm, leaving plaintiffs without standing to assert their "student assignment" claims. Next, with respect to plaintiffs' challenge to the ELL program, the District argues that no named plaintiffs suffered from any of the asserted program deficiencies, such as forced "early exit." Finally, with respect to the gifted program, the District argues that no named plaintiff participated in any elementary gifted program and thus has no standing to challenge such program. Citing *Wiesmueller v. Kosobucki*, 571 F.3d 699, 703 (7th Cir., 2009), the District argues that no named plaintiff had even a "realistic chance" of being identified as gifted.

Whether there is any merit to the District's argument depends on whether the named plaintiffs' claims are defined generally or specifically. Their general claims are that U–46 is a discriminatory school district that acts to keep whites and Minority Students separate. The District accomplished this, according to plaintiffs, in many ways, but the net result is that each Minority Student suffered the indignities of segregation and, under *Brown v. Bd. of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), each Minority Student in the District would have standing to challenge all of the segregational aspects and actions of the District.

If, as the District argues, plaintiffs' claims should be defined with more specificity, then a variance or disjuncture between the class representatives' claims and those of the class is created.[7] For example (accepting the District's argument), although no named plaintiff was ever in a gifted program and could not challenge it, other unnamed members of the class were and could. If this disjunctive is resolved by standing analysis, then plaintiffs might lack standing to bring the "gifted claims." If, on the other hand, this disjuncture is resolved by Fed. R. Civ. P, 23(a) analysis, as some courts have held, then once the court finds that the named plaintiffs have standing to bring any claims, the issue is simply whether under Rule 23 they are proper class representatives to litigate the other members' claims.

How such a variance or disjuncture should be analyzed has not been conclusively resolved. In several cases the Supreme Court has applied a Rule 23 analysis. *See Sosna v. Iowa*, 419 U.S. 393, 403, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975); *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982) (Mexican–American plaintiff passed over for promotion had standing to

---

7. The court certified two classes defined as:

(1) All current Hispanic and African–American [District] students who have been subjected to or continue to be subjected to the District's racial discrimination in student assignment and provision of programs and services resulting in instability of student assignments, assignment to non-neighborhood schools, assignment to overcrowded schools, transportation burdens, closure of Illinois Park School, program deficiencies in Limited English Proficiency ("LEP") services, or education deficiencies arising from the above conditions.

(2) All current Hispanic U–46 students who are receiving LEP services, or who have received LEP services by the District in the past four years, or who should have but did not receive LEP services, and who have been subjected to or continue to be subjected to deficiencies in the District's LEP services in the area of identification, exiting/transitioning, parent information, special education, or assignment to non-neighborhood schools.

pursue his and class members' claims for race discrimination in promotions but could not represent a class of applicants who were denied jobs in the first instance because the claims did not satisfy Rule 23(a)'s typicality and adequacy requirements).

In other cases, the Court has treated the disjuncture as a standing problem. For example, in *Blum v. Yaretsky*, 457 U.S. 991, 1001, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982), decided the same year as *Falcon*, the Court held that Medicaid patients challenging nursing home decisions to transfer them to a lower level of care did not have standing to represent patients transferred to a higher level of care. Again, in *Lewis v. Casey*, 518 U.S. 343, 357–60, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996), the case on which the District principally relies, the Court held that a prisoner alleging a denial of his right to access to the courts based on illiteracy could not represent others allegedly denied access to the courts because they could not speak English or were in lockdown.

[S]tanding is not dispensed in gross. If the right to complain of *one* administrative deficiency automatically conferred the right to complain of *all* administrative deficiencies, any citizen aggrieved in one respect could bring the whole structure of state administration before the courts for review. That is of course not the law. [*Id.* n. 6 (emphasis in original) ]

Finally, in *Gratz*, the Court struck down the University of Michigan's undergraduate race-based affirmative action admissions plan. The named plaintiff was a transfer applicant, but sought to also represent class members challenging the use of race in undergraduate freshman admissions. Addressing the argument raised by the dissent that the named plaintiff lacked standing to represent the additional class, the Court noted (539 U.S. at 262–63, 123 S.Ct. 2411):

[T]here is a question whether the relevance of this variation, if any, is a matter of Article III standing at all or whether it goes to the propriety of class certification pursuant to Federal Rule of Civil Procedure 23(a). The parties have not briefed the question of standing versus adequacy, however, and we need not resolve the question today: Regardless of whether the requirement is deemed one of adequacy or standing, it is clearly satisfied in this case.

*Gratz* also reiterated the Court's often-expressed view that "the 'injury in fact' in any equal protection case of this variety is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit." *Id.* at 262, 123 S.Ct. 2411.

■ Although this court is of the view that the disjuncture or variance issue is better addressed as an adequacy issue under Rule 23 once it has been determined that the named plaintiff has standing to bring a claim, it need not reach the issue because, like *Gratz*, either requirement is clearly satisfied. First, if the alleged harm is defined generally as Hispanic students being denied equal treatment based on their race, then under *Brown* and *Gratz*, plaintiffs have standing to challenge all the specific discriminatory policies and actions of the Board. Next, even if the harm asserted is defined specifically as the District insists, plaintiffs still have standing. There are at least three named plaintiffs who have attended schools that used mobiles to alleviate what plaintiffs argue would otherwise result in overcrowding. That gives them standing to challenge the student assignment plan, because these named plaintiffs have suffered concrete injury if the court were to find that the use of mobiles to relieve overcrowding results

in inferior educational opportunities or services to Minority Students. With respect to the ELL program, there is no question that there are at least four named plaintiffs who are in the ELL program, and have standing to challenge all of the methods employed as well as the results achieved.

Finally, with respect to the gifted program, although none of the named plaintiffs ever achieved test results that might suggest that they are "gifted," they certainly have standing to challenge the manner by which the District identified gifted students. Specifically, plaintiffs spent a large part of their case establishing that the District's method of identifying gifted students effectively eliminated from consideration many Minority Students simply because the tests used by the District measured achievement based on verbal skills. According to plaintiffs, every Minority Student, particularly Hispanics, were tested under these faulty procedures. Consequently, each has a right to challenge those procedures. It is impossible to turn back the clock to determine whether under proper testing any of the named plaintiffs might have been identified as gifted,[8] but nonetheless each has the right and standing to challenge the procedures used and, if successful, to force the District to alter those procedures. Accordingly, the court concludes that plaintiffs had standing to bring their claims when the suit was filed and have proved that standing at trial.

## II. *The 2004 Student Assignment Plan*

■■■■ Plaintiffs attack the District's 2004 Student Assignment Plan (the "2004 Plan") as violating their rights under the Equal Protection Clauses of the United States and Illinois Constitutions and the Illinois Civil Rights Act, 740 ILCS 23/5(a)(2) ("ICRA"). Their claims are grounded on two propositions: (1) the District intentionally discriminated against Minority Students when it chose to utilize a geographic, neighborhood school model in determining school boundaries; and (2) regardless of intent, the 2004 Plan had a disparate impact on Minority Students by forcing them to attend overcrowded schools that required the use of inferior mobiles to relieve the overcrowding. Although, as plaintiffs recognize, their equal protection claims require proof of both intentional discrimination and discriminatory effect, *Chavez v. Ill., State Police*, 251 F.3d 612, 635–36 (7th Cir.2001),[9] plaintiffs' claim under the ICRA requires only a disparate impact regardless of intent, *Jackson v. Cerpa*, 696 F.Supp.2d 962, 964 (N.D.Ill. 2010) (The ICRA "was expressly intended to provide a state law remedy that was *identical* to the federal disparate impact canon.") (emphasis in original). Consequently, plaintiffs' attack on the 2004 Plan under either the Fourteenth Amendment or the ICRA requires proof that the mobiles used by the District were inferior to the point of constituting a discriminatory impact.

■■■■ The court concludes that plaintiffs have failed to meet their burden of proof with respect to their claim that the mobiles used by the District are so inferior as to constitute a discriminatory impact on Minority Students. Plaintiffs' evidence on

---

8. The court notes that plaintiff Dinah McFadden was accepted to and attended the Streamwood High School World Language and International Studies Academy, one of the District's gifted programs.

9. The Seventh Circuit has held that equal protection challenges based on the Illinois Constitution should be interpreted under the same standards as federal equal protection claims. *See Smith v. Severn*, 129 F.3d 419, 424 n. 3 (7th Cir.1997).

this issue consisted primarily of the expert testimony of Edward Kazanjian[10] and certain statements by District personnel. It should be noted that the mobile classrooms at issue in this case are not merely trailers that have been converted into academic use. These are large, mobile structures more akin to small prefabricated houses than standard trailers. They are designed and built specifically for classroom use and are actually larger than many interior classrooms. They are ramped for accessibility and have full heating, air conditioning and other amenities that are found in regular interior classrooms.

Mr. Kazanjian testified that he had visited all the mobiles in the District and found some of them to be in unsatisfactory condition. To be sure, Mr. Kazanjian did offer evidence that at least a few of the mobiles being used in some of the Minority Schools had problems such as blocked exit doorways and needed repairs to some of the exterior features. Other problems that Mr. Kazanjian identified, such as walls cluttered with the students' artwork and exposed extension cords, could no doubt be found in interior classrooms as well as the mobiles he choose to select for presentation to the court. Indeed, Mr. Kazanjian appears to have "cherry picked" some of the worst mobiles that he found and avoided testifying about those that he found in good condition.

As the District points out, without a comparison between the condition of the mobiles and the condition of the interior classrooms, it is impossible for the court to find that the mobiles that were being used by the District were so inherently inferior as to constitute a disparate impact by themselves. Although certain features of mobile classrooms are no doubt undesirable as compared to interior classrooms, other features are arguably improvements over their interior counterparts. For example, each mobile has a water cooler inside the classroom, something that is not found in interior classrooms. In addition, mobiles are larger than some interior classrooms, Although students are inconvenienced by having to go outside to use the restroom in the adjacent buildings during bad weather, during good weather they benefit by getting some fresh air. Although plaintiffs claim that the students were put in danger by being allowed to go outside to the main building to use the restrooms, they presented no evidence to show that any student was in fact jeopardized or endangered while he or she was walking the short distance to and from the mobiles and the main buildings.

Equally important, the District's evidence established that mobiles are used throughout the country, and with respect to District U–46 mobiles are not used unless requested by the principal of the particular school, approved by a Board committee and the Board itself, and then approved by the Illinois State Board of Education's Regional Office of Education ("ROE"). Indeed, the ROE inspects all mobiles annually, as does the District's own architect, and must approve all mobiles for use. The District's expert credibly testified that all of the mobiles he inspected were below the industry standard of recommended age (20 years) and, with two exceptions, were at or above the recommended conditions in the industry.

Plaintiffs also rely on other evidence to support their claim that mobiles are inherently inferior. Plaintiffs have offered evidence that shows that the District generally regarded mobiles as an undesirable but necessary means to relieve overcrowding.

---

10. Mr. Kazanjian, a registered school business administrator, was offered by plaintiffs as an expert on the physical condition and viability of the District's facilities and mobiles.

The court agrees with plaintiffs that some of defendants' witnesses (called as adverse witnesses by plaintiffs) were less than forthcoming in describing their preference for avoiding the use of mobiles. These witnesses also explained, however, that the reasons for minimizing the use of mobiles included more than the quality of the mobiles themselves. Mobiles incur added costs and maintenance to the District, as well as additional administrative expenses involved in obtaining ROE approval.

Based upon its review of the extensive record developed concerning this issue, the court concludes that, although mobiles may not be an ideal situation for the children attending classes in them, they are not so inferior as to constitute a sufficient adverse impact that their use alone would result in a discriminatory action by the District against Minority Students. This conclusion defeats plaintiffs' claims under the Equal Protection Clauses of the United States and Illinois Constitutions, *Chavez*, 251 F.3d at 635–36, as well as the ICRA, *Jackson*, 696 F.Supp.2d at 964.

Even had the court concluded that mobiles were inferior, plaintiffs would be required to show intentional discrimination in their use and placement by the District to sustain their equal protection claims. Because this matter was hotly contested at trial, and colors plaintiffs' entire case regarding the 2004 Plan, the court will briefly address the issue. Plaintiffs' evidence does demonstrate that after the 2004 Plan was put into effect all but one group of four mobiles were used in the Minority Schools.[11]

The context in which the decisions to place mobiles were made is important in analyzing whether the District had a discriminatory purpose. After experiencing a dramatic increase in population, the District passed a bond issue in 2000 that allowed it to build six new schools. Prior to the 2004 Plan, the District, like many districts in the country, assigned students to schools where space was available, resulting in what the District termed "satellite" or "pocket" attendance zones in which students were assigned to schools to which they were not geographically connected. Thus, one purpose of the 2004 Plan was to eliminate these satellite zones so that children could attend schools closer to their homes.

After building the first three schools, the District faced an unexpected $40 million deficit (more than 10% of its budget) and consequently was forced to examine the attendance boundaries within the District and the challenge of accommodating an increasing student population within its means. In addition to its professional staff, the District hired a consultant, Dr. Jerome McKibben, a demographer with extensive experience in enrollment forecasts and school attendance boundaries, to help develop a plan to redistrict that eventually became the 2004 Plan. Dr. McKibben was given the Board's goals of eliminating satellite zones, creating contiguous, compact attendance areas with centrally located schools, and respecting natural boundaries. He was not instructed to consider programmatic factors in determining and recommending the attendance boundaries, an omission that plaintiffs claim evidences a discriminatory intent.

■ Needless to say, any decision to change school attendance boundaries is

---

11. The parties dispute whether Nature Ridge School (where the four mobiles mentioned above were located) should be categorized as a white or a Minority School. Plaintiffs claim that the ratio of white to Minority Students was 50/50, according to the 2009 ISBE report card, while defendant claims Nature Ridge was more than 50% white. The resolution of this disagreement is immaterial to the court's analysis.

bound to provoke public concern.[12] Adopting the concept of neighborhood schools when impartially maintained and administered does not, by itself, indicate a discriminatory purpose by the District's Board. *See Bd. of Ed. of Oklahoma City Pub. Schools v. Dowell,* 375 F.2d 158, 166 (10th Cir.1967). This is true even if the impact of the decision "bears more heavily on one race than another." *See Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 266, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). Impact alone is not determinative of invidious discriminatory purpose. If the decision impacts one race over another, the court looks to other evidence such as the historical background of the decision, the sequence of events leading up to the decision, and the legislative or administrative history of the decision. *Id.* at 267, 97 S.Ct. 555.

Plaintiffs contend that the District's adoption of a neighborhood school concept was a pretext for intentional discrimination. In addition to the instructions given to Dr. McKibben, plaintiffs cite certain statements made by District superintendent Dr. Connie Neale and Board President Karen Carney, as well as an alleged deviation from District guidelines. With respect to the comments by Dr. Neal and Ms. Carney, although a great deal of time was spent at trial and a great deal of space was spent in the briefing by the parties concerning this evidence, the court finds nothing in the comments to indicate that race or ethnicity was a factor in drawing the attendance boundaries embodied in the 2004 Plan. Quite the contrary, both Dr. Neal and Ms. Carney disavowed the use of race in the 2004 Plan, and merely commented that going forward the District

should not use Minority Students as a "desegregation program" in which those students were bused to schools outside their geographic area. As Dr. McKibben credibly testified, reducing the amount of busing within a large district like U–46 is a desirable result in determining attendance boundaries. These same considerations were part and parcel of the District's guidelines that existed before the 2004 Plan was constructed.

Plaintiffs also strenuously argue that the District should not have implemented the 2004 Plan over the vociferous objections of some of the population, the same population that had historically objected to excessive busing. Again, the redrawing of school boundaries often provokes opposition, which the District should (and in this case did) consider in making final decisions. Those decisions, however, are difficult educational judgments with which the court should not interfere absent proof of discriminatory intent—proof that is lacking in this case.

 It is clear to the court, considering all of the evidence and the extensive testimony presented at the trial, that the professional staff of the District, including its superintendent and board, were dealing with an increasing population generally, an increasing number of students who required special language support, a budgetary crisis, and an active, involved community. Regardless of the decisions ultimately made by the District, some portion of the population would be unhappy. The ultimate decision to adopt a neighborhood school concept that minimized busing and allowed children to attend schools nearer to their homes was not objectively unreasonable, nor in this court's opinion caused

12. The court and the parties are no doubt mindful of the recent heated controversies engendered by the Chicago Board of Education's decision to close a number of schools in Chicago, with the necessity of redrawing school attendance boundaries.

by any racial animus or preference by the District.

Finally, it should be noted that in plaintiffs' original complaint they alleged discrimination manifested by unnecessary busing and assignment of Minority Students to non-neighborhood schools, among other things. As the case evolved, plaintiffs took a 180 degree turn to complain about the assignment to neighborhood schools with less busing. The court does not doubt the sincerity of the representative plaintiffs or their good faith in prosecuting this litigation. Such sincerity, however, is not a substitute for proof of intentional discrimination. The court therefore finds in favor of defendant and against plaintiffs on their claims regarding the 2004 Redistricting Plan.

### III. *English Language Learners ("ELL") Program*

■ Plaintiffs claim that the District's ELL Program violates the Equal Education Opportunities Act ("EEOA"), which requires school districts to "take appropriate action to overcome language barriers that impede equal participation by its students in its instructional programs." 20 U.S.C. § 1703(f). As this court held in an earlier opinion in this case, the statute requires plaintiffs to prove: "(1) language barriers; (2) defendant's failure to take appropriate action to overcome these barriers; and (3) a resulting impediment to students' equal participation and instructional programs." *Leslie v. Board of Education for Ill. Sch. Dist. U–46*, 379 F.Supp.2d 952, 960 (N.D.Ill.2005). The Seventh Circuit has recognized that courts should apply the three-part test enunciated in *Castaneda v. Pickard*, 648 F.2d 989, 1009–10 (5th Cir.1981), as "a fruitful starting point." *Gomez v. Illinois State Bd. of Educ.*, 811 F.2d 1030, 1040–41 (7th Cir. 1987).

■ The *Castaneda* test asks whether a school district's ELL program: (1) is based on sound educational theory or principles; (2) is "reasonably calculated to implement effectively the educational theory adopted by the school"; and (3) "after a period of time sufficient to give the plan a legitimate trial, to produce results indicating that the language barriers confronting students are actually being overcome." 648 F.2d at 1009. As the Supreme Court, echoing language in *Castaneda*, cautioned in *Horne v. Flores*, 557 U.S. 433, 454–55, 129 S.Ct. 2579, 174 L.Ed.2d 406 (2009), courts should allow educational authorities "a substantial amount of latitude" in implementing ELL programs and should avoid "improperly substitut[ing] [their] own educational and budgetary judgments for those of the state and local officials to whom such decisions are properly entrusted."

Plaintiffs' attack on the District's ELL program begins with a critical report by the U.S. Department of Education's Office of Civil Rights ("OCR") in 1995. Although the conditions existing in 1995 are well beyond the limitations period for this case, plaintiffs refer to those conditions simply to put their claims into a historical context.

The gravamen of plaintiffs' claim begins with the hiring of Superintendent Connie Neale in late 2002. When Dr. Neale began her administration of the District, she became concerned that a large number of Hispanic students were not exiting the ELL program at all or only after more years than she considered appropriate. After all, "ELL" stands for English Language Learners, and if the children weren't learning English this would have indicated that the program wasn't working as intended. In certain communications Dr. Neale suggested what plaintiffs term an "early exit" approach that would require ELL students to exit the program after a

set period of time rather than when they became sufficiently English proficient. Had such a program actually been implemented, plaintiffs might have met their burden of proving an EEOA violation.

The evidence presented at trial, however, proved otherwise. Although Dr. Neale did suggest that the District consider an "early exit" program, it was implemented at most for only one academic year (2003–2004). Indeed, this suggestion met fierce resistance from a number of high-ranking District personnel, including its ELL director Dr. Dionnes Rivera. Rather than continuing a district-wide "early exit" three-year program, Dr. Neale (as discussed more fully below) acquiesced in the judgment of her subordinates, and implemented an exit program employing several criteria to avoid exiting students from ELL before they were ready.[13]

█ It is important to keep in mind that any historical problems with the District's ELL program are relevant only to put into context the facts that existed at the time discovery closed in 2009. Although no program of this size can be expected to be free of criticism or deficiencies, under the EEOA and *Castenada*, a school district is in compliance if it is following an established program that it has examined over time to make sure it is working. In the instant case, the evidence demonstrates that, contrary to plaintiffs' claim, the District (in the language of the EEOA) has taken "appropriate action to overcome language barriers that impede equal participation by its students in its instructional programs." Responding to changing state and federal regulation, including the 2001 No Child Left Behind Act ("NCLB," 20 U.S.C. § 6481), the District has instituted different models to instruct those children it has identified (and whose parents have agreed) as requiring English language instruction.

With respect to Hispanic students for whom Spanish was the primary language, the District instituted a transitional bilingual education ("TBE") program, which increases the amount of English used during the class each year that a student participates, in order to transition that student from his or her native language into English. The District also operates a "dual language" program, taught half in English and half in Spanish, in which half the students are native English speakers and half native Spanish speakers. For non-Hispanic students, the District has a transitional program of instruction ("TPI"), which is offered in schools with less than 20 students who share the same language background. Each of these program models has been approved by the Illinois State Board of Education ("ISBE").

With respect to students who exit from the ELL program, the District has used a "triangulation" approach, in which it considers the students' scores on the MAP[14] test, the scores on the state mandated assessment test, and a positive teacher recommendation. As required by NCLB (20 U.S.C. § 6841(a)(4)), the District monitors exited ELL students for at least two years to make sure they are sufficiently English proficient. The District offered convincing evidence that it has consistently provided remedial support for those exited

---

**13.** As the District points out, three of the named plaintiffs have been in the ELL program most of their years in District U–46. Karen, Rudolfo, and Kiara Tapia were in the District's ELL program for 6, 11, and 9 years respectively.

**14.** "MAP" stands for "Measures of Academic Progress." As will be discussed below in connection with the District's gifted student program, the MAP test favors children with high verbal skills and disfavors Minorities.

students who need it. Thus, although plaintiffs have identified a number of problems and concerns about the ELL program as it existed prior to the close of discovery in 2009, the court finds that by that time the District had established and recognized programs in place to educate its non-English speaking students in its educational programs.

Plaintiffs also complain about the lack of leadership and deficiencies in professional development and in hiring qualified ELL teachers. The court has reviewed this evidence, and finds that plaintiffs have failed to prove deficiencies sufficient to constitute violations of the EEOA. It should be noted, as recognized by a number of courts,[15] that there is a national shortage of qualified ELL teachers, and that the District has gone to great lengths to recruit such teachers for its increasingly diverse student body.

 Plaintiffs also attack the District's alleged violation of the "90% rule," a requirement by the ISBE regulations that ELL classes be 90% of the size of the general classrooms in the building in which they are situated. First, a violation of a state regulation does not necessarily equate to a violation of the EEOA. Plaintiffs are required to prove that such a violation, if it occurred, impeded the students' ability to learn English or participate equally in the District's instructional programs. Although plaintiffs have introduced evidence that the 90% rule was violated in certain instances, the evidence fails to show a systemic failure that results in an EEOA violation. Faced with a growing population of English language learners, a shortage of qualified ELL teachers, and the realities of shrinking educational budgets, the District has demonstrated to the court's satisfaction that it has taken

sincere, positive actions (such as the hiring of teacher's aides) to meet the 90% rule and provide adequate ELL instruction to its students.

Plaintiffs also attack the District's ELL program by claiming that the 2004 redistricting plan (which this court has found meets constitutional standards) violated ELL students' EEOA rights by concentrating Hispanic students in the neighborhood schools that resulted from the redistricting. Again, the court finds no constitutional or ICRA violation in the District's neighborhood school approach, and the fact that a large number of Hispanic students might be concentrated in those schools in neighborhoods in which there is a high concentration of Hispanic residents simply does not translate into unequal educational opportunities for those students. As the District grows and develops, no doubt many of these neighborhoods will change, and the school populations will change with them. District U–46, along with other large school districts throughout the country, will be challenged to continue providing English language education to those students who need it. Anecdotal or transitory deficiencies are best left to professional educators rather than the courts to correct.

Plaintiffs' final attack on the District's ELL program involves complaints about its data collection system. Although plaintiffs do identify certain problems with that system, the District's evidence convinces the court that it has taken sufficient steps, with the help of outside experts and institutions, to take appropriate action within the meaning of the EEOA to address these problems. This includes procedures for identifying those children who need ELL instruction, tracking their progress, pro-

**15.** *See, e.g., Teresa P. v. Berkeley Unified Sch. Dist.,* 724 F.Supp. 698, 714–15 (N.D.Cal. 1989); *Tasby v. Moses,* 265 F.Supp.2d 757, 770 (N.D.Tx.2003).

viding additional supports for exited ELL students, and other monitoring activities. The court finds no EEOA violation in the District's data collection and maintenance procedures.

For these reasons, the court finds against the plaintiffs and for the District with respect to plaintiffs' claims regarding the District's ELL program.

## IV. *District U–46's Gifted Program*

 Segregating public school children on the basis of race or ethnicity is inherently suspect. Programs that segregate public school children by ethnicity are subject to strict scrutiny, and the school district bears the burden to show that its actions are narrowly tailored to achieve a compelling governmental interest to have such a program. *Parents Involved in Community Schools v. Seattle School Dist. No. 1*, 551 U.S. 701, 720, 127 S.Ct. 2738, 168 L.Ed.2d 508 (2007). To do so, the District bears the burden to prove "that the reasons for any racial classification are clearly identified and unquestionably legitimate." *Fisher v. Univ. of Texas at Austin*, —— U.S. ——, 133 S.Ct. 2411, 2419, 186 L.Ed.2d 474 (2013) (quoting *Richmond v. J.A. Croson Co.*, 488 U.S. 469, 505, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989)). The ELL Program discussed above is one such instance. Obviously, children who are not English language proficient because of their ethnicity will best be served by a separate program that teaches them how to speak, read and write English. A gifted program that segregates children in their core academic classes based on their ethnicity, however, does not qualify. Children

of any race or ethnicity can be gifted, and in fact in the case of District U–46 children of all races and ethnic backgrounds have been so identified. Each child enrolled in the District's elementary schools has the right to be tested fairly and educated properly with his or her peers without regard to the child's ethnicity.

The District's elementary school children are tested and identified for the gifted program while they are in the second and third grades. The elementary gifted program begins in grade four and continues through grade six.[16] The "mainstream" program run by the District is known as SWAS ("school within a school"). Children who are in the SWAS program are then tested in the sixth grade to see whether they wish to and are qualified to participate in the middle school gifted program. For many years, the District has run a *separate* program especially for Hispanic students who are identified as gifted. This program is known as SET/SWAS ("SET" stands for "Spanish English Transition"), and its classes are taught in Spanish and English by bilingual teachers. SWAS classrooms are located in three elementary schools that plaintiffs claim are predominately white. SET/SWAS classrooms are located in two schools that plaintiffs claim are predominately Minority. Both the SWAS and SET/SWAS programs are voluntary, and both teach the same academic curriculum.

As described by the District's witnesses, the gifted children who are placed into the SET/SWAS Program (possibly with a few insignificant exceptions) are all Hispanic students [17], whose primary language is

---

16. At trial, plaintiffs narrowed their case with respect to the gifted program to the elementary school program only,

17. Although the District claims that there are students in SET/SWAS who are not Hispanic, Superintendent Torres testified otherwise.

Even if the court were to credit the District's curious claim that there are a few non-Hispanic children in its elementary SET/SWAS program (after all, the first "S" stands for "Spanish," and the class is taught in Spanish and English), the evidence is clear that most

Spanish. Most if not all have exited the ELL Program [18] or were otherwise sufficiently English proficient to be in regular English-only classes.[19] That is, the SET/SWAS students were generally English proficient to the extent that they could participate in a regular English-taught academic setting, and have been identified as gifted. A minuscule number of gifted Hispanic students are accepted into the regular SWAS Program. The SET/SWAS students integrate with children in their schools who are not in the gifted program for "non-core" classes such as physical education, art and music. SET/SWAS students do not intermingle with SWAS students and, from the evidence presented, SET/SWAS students rarely, if ever, moved into the SWAS program.

The District's reasoning behind operating a separate, segregated program is that, in its view, these gifted students were not English proficient enough to perform well in the higher achieving gifted program classes. Although this sounds like it might be a debatable educational judgment, the court finds that the District has not met its burden of proving that a segregated program like SET/SWAS is necessary to educate gifted Hispanic students. Put another way, the District has failed to establish that the SET/SWAS program was narrowly tailored to further a compelling governmental interest.

First, the court notes that the evidence established that the District is the only school district in the United States to operate a segregated gifted program for Hispanics.[20] The students chosen for the mainstream elementary SWAS program are identified initially by scoring 92%[21] or greater on an achievement test known as the MAP test,[22] which plaintiffs' witnesses credibly demonstrated favored children with higher verbal skills and disfavored Minorities. Thus, gifted children for whom English is a second language would likely score lower on a MAP test than other available tests such as the non-verbal, culturally neutral Naglieri Nonverbal Aptitude Test, which plaintiffs' expert testified identified gifted students without a bias towards those students with higher English verbal skills.

Although the parties presented conflicting evidence regarding the degree to which the District relied on the MAP scores to identify children for the elementary SWAS program, the court finds that the weight of the evidence supports plaintiffs' contention that the MAP scores were the primary tool used to place students in elementary SWAS. Thus, unless a child scored 92% or more on the MAP, he or she was generally not considered for further testing and evaluation to determine whether he or she was eligible for the mainstream gifted SWAS program. Children were chosen for the SET/SWAS program

---

all of the SET/SWAS students are in fact Hispanic and, as noted below, very few Minority Students are included in the mainstream elementary SWAS program.

18. There was some testimony indicating that a small number of SET/SWAS students have not yet exited ELL. As the District's expert, Dr. Callahan, testified, this would have been "a rare exception."

19. Approximately 20% of the elementary students in the District were non-ELL Hispanics.

20. The District's former gifted program director, Dr. Klein, claimed that he modeled the SET/SWAS on a program operated by the Chicago public school system, a fact plaintiffs dispute and for which there is no evidence other than Dr. Klein's unsupported statement.

21. This number varied slightly over the years, but generally was around the 90% mark.

22. See fn 14, supra.

by their scores on the non-verbal Naglieri test, a Spanish language achievement test (Logramos) and classroom observations by teachers and specialists, along with their MAP scores.

The results of this process were predictable. For example, in the school year 2006–2007—when 9,476 Hispanic students constituted 43.8% of the District's elementary school population and 1,363 African–American students constituted 6.3%—only five of the 231 students enrolled in the mainstream SWAS program (2%) were Hispanic, and only 2 students (less than 1%) were African–American. Similarly low numbers were recorded in the school years from 2007 through 2009. Likewise, in middle school SWAS, only 20% of the students were Hispanic and 2% were African–American in the school year 2006–2007. Similarly disparate participation was recorded in middle school, and even worse participation in high school gifted programs by Minority Students were recorded in subsequent school years.[23] Although the District takes issue with some of the methodology employed by plaintiffs in offering these statistics, there is no doubt that Minority Students do not participate in the mainstream gifted programs in District U–46 at anything close to their proportion of the District's population.[24]

Because much of the evidence about the District's gifted program was presented through the parties' respective expert witnesses (plaintiffs' Dr. Donna Ford and defendant's Dr. Carolyn Callahan), the court will briefly discuss these experts. Initially, the court notes that both Dr. Ford and Dr. Callahan are highly qualified, experienced professionals in the subject of gifted education. Based on their demeanor at trial and the thoroughness of their analyses, however, the court credits Dr. Ford's testimony over that of Dr. Callahan in the many areas about which they disagree. Dr. Callahan, unlike Dr. Ford, appeared to be totally biased in favor of the District, which she obviously regards as a model institution with few if any flaws or areas that need improvement. She could find little fault with any aspect of the District's gifted program, and generally refused to acknowledge the obvious distinctions between the segregated SET/SWAS and the mainstream SWAS programs. Dr. Callahan's demeanor on the witness stand and reluctance to respond forthrightly to pertinent questions by plaintiffs' counsel diminished her credibility with the court.

Dr. Ford, on the other hand, demonstrated a superior knowledge of the subject and in fact authored the NAGC's[25] protocol used to identify children for gifted programs. In plaintiffs' Ex. 120, the NAGC's position paper titled "Using Tests to Identify Gifted Students," the NAGC warned against using a single test (such as the MAP) to include or exclude a child for gifted education, because every standardized test contains biases that could skew the results. Although the District used what it termed a weighted "matrix" to identify students for the mainstream SWAS program that included the MAP scores, performance on the Cogat[26] test,

---

**23.** The statistics for school years 2006–2007, 2007–2008, and 2008–2009 (when discovery closed) are summarized in Plaintiffs' Exhibits 1165 and 1165A.

**24.** In 2006–2007, for example, 2% to 3% of the white students in elementary school were placed in SWAS; only .05% (5/9475) of Hispanics and .15% (2/1363) of African Americans were in SWAS.

**25.** The National Association for Gifted Children, which both sides regarded as a national organization that set standards for best practices in this area.

**26.** The Cogat (Cognitive Abilities Test) is another widely-used achievement test that emphasizes verbal skills.

and teacher and parent recommendations, the court credits Dr. Ford's opinion that this procedure produces discriminatory results because it relies too heavily on achievement criteria. As plaintiffs have demonstrated, a child can be a high achiever without being gifted, and can be gifted without being a high achiever.

Dr. Ford credibly opined that the best way to identify gifted children, as recognized by the NAGC, is to measure intelligence non-verbally (with a test such as the Naglieri) with language supports for children whose first language is not English. If a test such as the MAP is used, setting a standard of 90% or greater (as did the District) is far too high given cultural and language impediments to verbal skills; in Dr. Ford's opinion, if such a test is used at all, the threshold should be 80% rather than 90%. In addition, Dr. Ford found, and the court credits her testimony, that teacher recommendations are unreliable measures when used as an initial screening to identify gifted children. Although all of these criteria can be used in a "matrix" or mix of identifying information, over-reliance on verbal testing, such as utilized by the District, will exclude many gifted Minority Students.

In Dr. Ford's opinion, which this court credits, the disproportionately low number of minority children in the mainstream gifted SWAS program proves that the District's method of testing is discriminatory. Although Dr. Ford testified that, ideally, participation in gifted programs by minorities would roughly equal their proportion of the student population, she recognized that a 20% allowance for cultural differences and voluntary exclusion from gifted programs by minorities was to be expected. Thus, with a population of approximately 40% Hispanic, the District should expect approximately 32% of the children in its mainstream gifted program to be Hispanic. The fact that only 2% of the children in SWAS were Hispanic demonstrated to Dr. Ford, and the court, that the District's method of identifying gifted Minority Students was flawed and resulted in an obvious disparate impact on those students by separating them from their gifted white peers. Indeed, both sides in this case agree that children for whom English is a second language acquire English skills more proficiently by being educated with native English speaking students. By singling out most all gifted Hispanics students for the segregated SET/SWAS program, the District deprived these children of that educational opportunity based on their ethnicity.

The low numbers and percentages of Hispanic students in the mainstream SWAS gifted program can be viewed from another perspective. The testimony at trial from the District's witnesses (including Dr. Klein, who devised SET/SWAS and retired in 2009) revealed that approximately 20% of the Hispanic students spoke fluent English and thus did not require ELL. Taking the 2006–2007 school year as an example, 20% of the 9,476 Hispanic elementary population is 1,895, Because approximately 2 to 3% of the white student population were identified as gifted and enrolled in SWAS, one would expect approximately 47 English speaking Hispanic students (2.5% of 1,895) (in addition to those students who had exited ELL) to have been placed in SWAS with sufficient English proficiency to succeed with or without language supports.[27] Even dis-

---

27. Remarkably, when the court attempted to explore this issue with the District's expert, Dr. Callahan, she responded, "I don't have enough data to answer that." When asked on follow-up cross examination whether native English speaking gifted Hispanic students would be placed in SET/SWAS, Dr. Callahan answered, "I don't know."

counting for actual or other minority-based preferences, the fact that only five Hispanic students were in SWAS that year demonstrates that serious flaws existed in identifying gifted Hispanic children, resulting in a serious disparate impact on the Hispanic population.

As mentioned above, the District defended the SET/SWAS program by arguing that, although the English skills of students placed in that program (most all of whom had passed through the District's ELL program satisfactorily or were otherwise sufficiently English proficient) were enough to participate in the regular classrooms taught in English, those students were not proficient enough in English to participate in English-only classrooms operating at the advanced academic levels of the mainstream SWAS program. Thus, according to the District, SET/SWAS, which is taught in both English and Spanish, allowed these students to acquire English skills while providing them with a curriculum designed for gifted students. Further, the District argues that many SET/SWAS students went on to achieve academic success.[28]

To be sure, there are successful African–Americans who attended segregated schools in the South and elsewhere before *Brown v. Board of Education*. Those scattered success stories no more justified segregating Blacks in Topeka, Kansas, than the anecdotal success stories from District U–46 justify educating a portion of the District's Minority Students in a setting segregated by ethnicity.

As plaintiffs demonstrated at trial, the District had viable proven alternatives to the segregated SET/SWAS program, the most prominent and obvious of which is a single, elementary gifted program that provides individual students with language support when those students needed it.[29] The District chose instead to separate gifted Hispanic students from their white peers, thus perpetuating the cultural distinctions and barriers to assimilation that our nation's civil rights laws are dedicated to prevent. That this segregation occurs at the stage of a child's education and life when he is most vulnerable to identifying his opportunities by cultural differences only aggravates an otherwise obvious disparate impact on these children. Because the elementary gifted program is designed to be the gateway to the middle and high school gifted programs and academies, the apparent reluctance by minority children to enter these non-diverse programs is the natural and unacceptable consequence of segregating children in the SET/SWAS program.

In fact, the District presented a fine young woman, Liliana Bonilla, whose testimony demonstrated the fallacy of defendant's position. Although Ms. Bonilla was highly English proficient and an "A" student,[30] and although she was on a team that won a District-wide "Battle of the Books" that required her to read and understand English language books in fourth grade, she was placed in SET/SWAS rather than the mainstream gifted SWAS program, which Ms. Bonilla did not even know existed. As plaintiffs point out, if Ms.

**28.** As discussed below, the District presented an exceptionally high achieving former—SET/SWAS student, Liliana Bonilla to make this point.

**29.** As discussed previously, in defending the ELL program, the District demonstrated that it supplied such supports to English language learners after they exited ELL, including former SET/SWAS students enrolled in middle school SWAS.

**30.** Ms. Bonilla testified that she scored 32 (out of 36) on her ACT test and graduated 16/449 in her high school class.

Bonilla was offered as a prototypical SET/SWAS success story, one can only wonder how many other highly talented and gifted Hispanic children were educated in an unnecessarily segregated setting rather than integrated with the full range of children in the District.

 This brings the court to the hotly contested issue of intent. As discussed previously, proof of discriminatory intent is unnecessary under the ICRA; disparate impact is enough under that Illinois statute. Moreover, discriminatory intent (required for plaintiffs' equal protection claims) may be established without proof of an evil or racist motive. *Elston v. Talladega County Bd. of Educ.*, 997 F.2d 1394, 1406 (11th Cir.1993). "[T]he intent which triggers a finding of unconstitutionality is not an intent to harm [minority] students, but simply an intent to bring about or maintain segregated schools.... Benevolence of motives does not excuse segregative acts." *U.S. v. Sch. Dist. of Omaha*, 521 F.2d 530, 535 (8th Cir.1975).

Although the court finds no evidence establishing racial or cultural animosity [31], there is no question that the District placed gifted Hispanic students in SET/SWAS based solely on their cultural identity. Indeed, SET/SWAS admits only Hispanic children who have passed through the District's ELL program or are otherwise sufficiently English proficient to suc-

ceed in mainstream classes. As discussed above, this is not the result of a neutral policy like preferring veterans in hiring, as in *Personnel Administrator v. Feeney*, 442 U.S. 256, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979); instead, the District intentionally singled out one ethnic group for segregated rather than integrated instruction. Thus, as plaintiffs argue, the disparate impact created by the SET/SWAS program does not alone prove discriminatory intent, but is strong evidence of such intent because that impact was known by the District and allowed to continue. The "inevitability or foreseeability of consequences" permits "a strong inference that the adverse effects were desired." *Id.* at 279 n. 25, 99 S.Ct. 2282. The court finds, therefore, that plaintiffs have proved intentional discrimination with respect to their claims regarding the District's elementary gifted program.[32]

For these reasons, the court holds that plaintiffs have met their burden of proving that the District's gifted program for its elementary schools violated the United States and Illinois Constitutions' Equal Protection Clauses, as well as the Illinois Civil Rights Act, for the period addressed at trial.[33]

### CONCLUSION

For the foregoing reasons, the court finds:

---

**31.** As the District notes, many of its administrators, including its superintendent Jose Torres, are Hispanic, Moreover, the court found Dr. Klein, who had developed the SET/SWAS program, to be sincere and well-intentioned, although under the law those intentions were misguided.

**32.** At trial plaintiffs presented scant evidence other than the statistics showing that African–American students were disproportionately impacted by the District's gifted program. Because SET/SWAS was directed only at Hispanics, these findings do not apply to African–

American students. Although the evidence suggests that non-verbal testing may reduce or eliminate the disparities affecting African–Americans in SWAS, the court will address this issue in the remedial phase of this litigation.

**33.** The court notes that at trial there was some mention that the District's testing for and administration of its elementary gifted program might have changed after the close of discovery. The court will address this in due course.

(1) Plaintiffs have standing to bring the claims presented at trial.

(2) In favor of the District and against plaintiffs on the claims regarding the 2004 student assignment plan.

(3) In favor of District and against plaintiffs regarding the claims concerning the District's ELL program.

(4) In favor of plaintiffs and against the District with respect to the District's gifted elementary school program at the time discovery closed in 2009.

Because any remedy with respect to the gifted program must account for the current status of that program-including the District's method for identifying gifted elementary students and whether the District has continued to operate a separate, segregated program like SET/SWAS—the parties are directed to appear on July 25, 2013, at 2:00 p.m. to discuss the final stage of this litigation. Should the court find that, consistent with the holdings of this opinion, the District's gifted program continues to violate the constitutional and statutory rights of the plaintiff class, the court will direct the District to submit a remedial plan. *See Corey H. v. Board of Education,* 995 F.Supp. 900, 918 (N.D.Ill. 1998).

